# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

**PURCHASING POWER, LLC,**

            **Plaintiff,**

    **v.**                                          **1:12-cv-258-WSD**

**BLUESTEM BRANDS, INC.,**

            **Defendant.**

## OPINION AND ORDER

This matter is before the Court on Defendant's Motion for Summary

Judgment [127] and Plaintiff's Motion for Trial by Jury [155].

## I.    BACKGROUND

This is a commercial dispute between companies that compete in the

business of "payroll deduction" sales.  Plaintiff Purchasing Power, LLC

("Plaintiff") alleges that Defendant Bluestem Brands, Inc. ("Defendant")

misappropriated Plaintiff's trade secrets, violated provisions of a confidentiality

agreement between the parties, and engaged in fraud against Plaintiff.

A.    Factual Background[1]

Defendant is a national retailer whose business largely consists of selling consumer products to low-income and "credit-constrained" customers by allowing purchases to be completed with payments "over time."  (SUMF ¶¶ 3–5.)  Purchases are made through mail order catalogs and over the internet.  (Id.)  At least as early as March 2010, Defendant began exploring methods to sell more "big ticket" items, priced between $500 and $2,000.  (Id. ¶ 19; Resp. SUMF ¶ 19.)

Plaintiff is a retailer that sells "big ticket" consumer products through a "voluntary payroll deduction" program called Purchasing Power.  (See SAMF ¶¶ 1–6.)  Plaintiff markets Purchasing Power to employers as a benefit to offer to their employees.  (See id.)  Under the program, employees may purchase products from Plaintiff and pay for them by having installment payments deducted from

---

[1] These facts are taken from Defendant's Statement of Undisputed Material Facts [127-2] ("SUMF") and Plaintiff's Statement of Additional Material Facts [146] ("SAMF"), submitted in accordance with Local Civil Rule 56.1.  Where a party disputed a factual assertion contained in a statement of facts, the Court also considered the specific exhibits cited in support of the assertion.  See LR 56.1(B)(3), NDGa (providing that the court deems a party's SUMF citation as supportive of the asserted fact "unless the respondent specifically informs the court to the contrary in the response").  In numerous instances, the parties asserted, in their responses to the statements of facts, additional facts not relevant to admitting or disputing a fact.  These factual assertions are not permitted under Local Civil Rule 56.1 and are improper because they deny the opposing party the opportunity to respond.  The Court does not consider these extraneous argumentative facts.

their paychecks.  (See id.)

In June 2010, one of Defendant's investors informed Defendant's CEO that Plaintiff's business might be for sale and could represent a business opportunity for Defendant.  (SUMF ¶¶ 74–77.)  Defendant's executives, who were not previously aware of Plaintiff or its Purchasing Power business model, conducted preliminary research on Plaintiff and determined that its "payroll deduction" model could be a way for Defendant to expand into the "big ticket" product purchase market.  (Id. ¶ 78.)  Defendant's executives expressed their interest in meeting with Plaintiff, and Defendant's investor arranged a telephone meeting between the parties' principals to be conducted July 27, 2010.  (Id. ¶¶ 84–85.)  During the July 27, 2010, telephone call, the parties exchanged general information about their respective businesses.  (Id. ¶ 85.)

The next day, on July 28, 2010, Defendant commenced an internal effort, named "Project Cortes," to evaluate developing its own "payroll deduction" model for "big ticket" sales.  (Id. ¶¶ 108–109.)  The Project Cortes team, which included employees with consumer credit experience, began researching a "go-to-market" strategy for a payroll deduction sales program.  (Id. ¶¶ 112–113, 115–117.)

In August 2010, Plaintiff and Defendant indicated their mutual interest in pursuing a merger of their businesses, or an acquisition of Plaintiff by Defendant.

(Id. ¶ 90.)  The parties agreed to enter into a Non-Disclosure Agreement ("NDA") to govern the exchange of business information during the parties' business combination negotiations.  (Id.)  Defendant's in-house counsel drafted the NDA, which the parties entered into on September 1, 2010.  (Id. ¶¶ 91, 97.)

The NDA stated that the parties were "engaged in competitive businesses." (SAMF ¶ 68.)  The NDA also provided that Plaintiff would provide "confidential information," as defined in the NDA, to Defendant to allow Defendant to conduct due diligence in connection with its evaluation of whether to purchase or otherwise invest in Plaintiff.  (SAMF ¶¶ 67, 70.)  Section 4 of the NDA prohibited Defendant from using any "confidential information" for any purpose other than due diligence.  (SAMF ¶ 67.)  Section 6 of the NDA required Defendant to allow Plaintiff access to review Defendant's "operations and procedures to ensure compliance" with the NDA's requirements.  (SUMF ¶ 100.)

From mid-September to early December 2010, Defendant conducted its evaluation of Plaintiff's business in a project Defendant named "Project Braves." (Id. ¶ 130.)  In September 2010, after the NDA was executed, Defendant separated the Project Braves and Project Cortes teams.  (Id. ¶ 123.)  The separation was to avoid the communication of information shared with Defendant during business

combination negotiations to members of the Project Cortes team.  (<u>Id.</u>)[2]  The
Project Cortes team continued to develop a payroll deduction product, including by
meeting with Defendant's payroll department to understand payroll deduction,
researching the applicability of sales taxes, and meeting with benefits brokers to
determine an effective broker commission.  (<u>Id.</u> ¶¶ 245, 253.)

　　　While Defendant's Project Cortes work was ongoing, Plaintiff's and
Defendant's executives met at each other's headquarters on different occasions in
connection with their business combination discussions.  (<u>Id.</u> ¶¶ 131, 134.)  During
one of these meetings, an executive of Defendant told Plaintiff's executives that he
had never before considered a payroll deduction product like Purchasing Power.
(<u>Id.</u> ¶ 133.)  Over the course of Defendant's due diligence to consider merger with
or acquisition of Plaintiff, Plaintiff disclosed information to Defendant that
Plaintiff characterizes as "confidential" under the NDA and a "trade secret" under
state law.  (<u>See, e.g.</u>, SAMF ¶¶ 121–125.)

　　　On December 17, 2010, Defendant made its formal offer to purchase
Plaintiff's business.  (SUMF ¶ 150.)  Plaintiff rejected the offer, and did not make
a counteroffer.  (<u>Id.</u> ¶ 152.)  On January 5, 2011, Plaintiff informed Defendant that

---

[2] The parties dispute whether the separation of the teams was maintained after the
end of Project Braves in January 2011.

it was formally terminating its negotiations with Defendant, and requested Defendant to return or destroy Plaintiff's confidential information as provided by the NDA.  (SAMF ¶ 140.)  On February 23, 2011, Defendant's in-house counsel advised Plaintiff that Defendant had returned or destroyed Plaintiff's confidential information that was provided.  (Id. ¶¶ 141–142.)

During the parties' negotiations, Defendant did not disclose to Plaintiff the Project Cortes work Defendant had commenced to evaluate offering its own payroll deduction product purchase system.  (Id. ¶ 219.)

In July 2011, the payroll deduction product Defendant developed was branded by Defendant as "PayCheck Direct."  (SUMF ¶ 259.)  In November 2011, Defendant launched a "beta" version of its PayCheck Direct by offering it to Defendant's employees.  (Id. ¶ 270.)  In May 2012, Defendant, having refined its program during its beta test, began marketing its PayCheck Direct program to outside clients.  (Id. ¶¶ 272–273.)  The final version of PayCheck Direct was in some respects similar to, and in other respects different from, the Purchasing Power program.  (See id. ¶ 274; SAMF ¶ 215.)  For example, differences between the programs' features included the following:

| Feature | PayCheck Direct | Purchasing Power |
|---|---|---|
| SKUs | 1200 "offers" | 775 "offers" |
| Assumed participation rate | 5% to 10% | 5% |
| Assumed loss ratio | 8% to 10% | 5% to 6% |
| Average order size | $1,000 | $1,300 |
| Spending limit as a percentage of income | 3% to 3.5% | 6.5% to 7.5% |

(SAMF ¶ 215.)[3]

In November 2011, Plaintiff learned that Defendant's PayCheck Direct product was being offered and responded by demanding to review Defendant's compliance with the NDA, as provided by Section 6 of the NDA.  (Id. ¶ 216.) Defendant responded by advising Plaintiff that it had returned or destroyed all of Plaintiff's confidential information.  (Id. ¶ 217; SUMF ¶ 276.)  It was later discovered that Defendant was, after November 2011, in possession of some of Plaintiff's confidential documents.  (SAMF ¶ 223.)[4]

B.     Procedural History

1.     *Pleadings and Motion to Dismiss*

On December 21, 2011, Plaintiff filed this action against Defendant in the

_____

[3] These differences are shown on a chart, prepared by Plaintiff, comparing the two products.  (See SAMF ¶ 223.)  Defendant submitted a separate chart detailing numerous additional differences between the products.  (See SUMF ¶ 274.)

[4] There is not any evidence that these documents were withheld from destruction for use by the Project Cortes team.  Defendant claims they were maintained inadvertently.  (SAMF ¶ 225.)

Superior Court of Fulton County, Georgia.  In its Complaint [1-1] (the "Original Complaint"), Plaintiff essentially asserts four (4) claims: (i) violation of the Georgia Trade Secrets Act (Count I); (ii) breach of contract (Count II); (iii) fraud, including both fraudulent misrepresentations and fraudulent omissions (Count IV); (iv) and negligent misrepresentation (Count V).[5]

On January 25, 2012, Defendant removed the action to this Court on the basis of diversity jurisdiction.

On February 2, 2012, Defendant filed a Motion to Dismiss [12] seeking dismissal of Plaintiff's fraud and negligent misrepresentation claims on multiple grounds, including because the claims were not pleaded "with particularity" as required under Rule 9(b) of the Federal Rules of Civil Procedure.  In its opposition to the Motion to Dismiss, Plaintiff requested leave to re-plead its fraud and negligent misrepresentation claims "if the Court finds that Plaintiff's allegations . . . are insufficient to state a claim for fraud and/or negligent misrepresentation."[6]  (Pl.'s Opp'n Mot. Dismiss [26] at 22–23.[7])  On July 27, 2012,

_____

[5] The Original Complaint also asserts as separate "counts" claims for "Preliminary and Permanent Injunction" (Count III), "Punitive Damages" (Count VI), and "Attorney's Fees" (Count VII).

[6] Plaintiff did not request leave to assert any additional claims.

[7] Citations are to ECF page numbers.

the Court entered an Order [35] granting Defendant's Motion to Dismiss on the ground that the fraud and negligent misrepresentation claims failed to satisfy Rule 9(b).  In its Order, the Court granted Plaintiff's request to re-plead, allowing Plaintiff "to file an amended complaint within twenty (20) days . . . to address the pleading shortcomings identified."  (Order [35] at 18.)  The Court did not grant Plaintiff leave to assert any additional claims.

On August 16, 2012, Plaintiff filed its Amended Complaint [39] re-pleading the Original Complaint's fraud and negligent misrepresentation claims.  Plaintiff also included in the Amended Complaint, as Counts VI and VII, new claims for tortious interference with contractual relations and tortious interference with business relations.  Plaintiff did not seek, and the Court did not grant, leave to assert these tortious interference claims.

    2.    *Discovery*

Discovery began when the Court issued its July 27, 2012, Order on Defendant's Motion to Dismiss.  Several discovery disputes arose shortly after discovery started.  Principal among them was Plaintiff's claim that Defendant failed to produce numerous documents pertaining to the alleged misappropriation of the claimed trade secrets, and Defendant's claim that Plaintiff had failed to specifically identify the trade secrets it alleged were misappropriated.  On

August 29, 2013, the Court conducted a telephone conference with the parties to resolve this dispute.  As a prerequisite to Defendant's document production, the Court ordered that Plaintiff answer Defendant's interrogatory requiring Plaintiff to "[i]dentify with particularity" its alleged trade secrets.  (See Hr'g Tr. [41] at 9–10; see also Def.'s Tab 302 [136-35] at 4.)

On September 4, 2012, Plaintiff responded to Defendant's interrogatory, requiring Plaintiff to specifically identify its alleged trade secrets.  Plaintiff's response identified twelve (12) broad categories of information stating that Defendant "was provided with detailed information" in these categories.  These categories were described as: (i) "confidential financial data," (ii) "credit facilities," (iii) "credit underwriting matrices," (iv) "portfolio performance/analysis," (v) "customer profiles," (vi) "sales and marketing information," (vii) "shipped revenues," (viii) "repeat buyers," (ix) "industry concentrations," (x) "merchandising trends," (xi) "product development information," and (xii) "operations and IT."  (SUMF ¶ 302; Def.'s Tab 302 [136-35] at 4–5.)

On November 21, 2012, following a protracted dispute between the parties over the specificity of Plaintiff's identification of its alleged trade secrets, Plaintiff's counsel sent to Defendant's counsel a letter identifying, by Bates

number, fifteen (15) documents it claimed contained Plaintiff's alleged trade secrets.  (See SUMF ¶ 304; Def.'s Tab 304 [137-1] at 16–17.)  The letter did not identify the specific information in the documents that Plaintiff alleges are its trade secrets.

### 3.   *Pending Motions*

On May 17, 2013, Plaintiff filed its Motion for Trial by Jury seeking leave to untimely request a jury trial in this matter.

On July 1, 2013, Defendant filed its Motion for Summary Judgment seeking judgment in its favor on all of Plaintiff's claims.

In connection with the Motion for Trial by Jury and the Motion for Summary Judgment, the parties submitted to the Court redacted briefs and numerous exhibits with redactions.  The parties, however, failed to file, under seal or otherwise, unredacted versions of their submissions.  At the Court's direction, the parties re-filed their respective Motions, along with unredacted submissions, on March 17 and 18, 2014.[8]

---

[8] In this Order, the Court refers to, and relies on, the unredacted submissions.

## II.    DISCUSSION

### A.    <u>Legal Standard</u>

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Parties "asserting that a fact cannot be or is genuinely disputed must support that assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1).

The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact.  <u>Herzog v. Castle Rock Entm't</u>, 193 F.3d 1241, 1246 (11th Cir. 1999).  Once the moving party has met this burden, the non-movant must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial.  <u>Graham v. State Farm Mut. Ins. Co.</u>, 193 F.3d 1274, 1282 (11th Cir. 1999).  Non-moving parties "need not present evidence in a form necessary for admission at trial; however, [they] may not merely rest on [their] pleadings." <u>Id.</u>

The Court must view all evidence in the light most favorable to the party

opposing the motion and must draw all inferences in favor of the non-movant, but only "to the extent supportable by the record." Garczynski v. Bradshaw, 573 F.3d 1158, 1165 (11th Cir. 2009) (quoting Scott v. Harris, 550 U.S. 372, 381 n.8 (2007)).  "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . ." Graham, 193 F.3d at 1282.  "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." Herzog, 193 F.3d at 1246.  But, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment for the moving party is proper.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

B.    Analysis

Defendant seeks summary judgment on all of the substantive claims asserted in the Amended Complaint, including misappropriation of trade secrets, breach of contract, fraud, negligent misrepresentation, and tortious interference.

1.    *Misappropriation of Trade Secrets*

In its trade secrets claim, Plaintiff alleges that Defendant misappropriated various of Plaintiff's trade secrets.  Plaintiff alleges these trade secrets were shared with Defendant to perform due diligence for a potential combination with Defendant's business.  Plaintiff claims Defendant used the trade secrets it shared to

develop Defendant's PayCheck Direct business.

"A claim for misappropriation of trade secrets under the Georgia Trade Secrets Act requires a plaintiff to prove that '(1) it had a trade secret and (2) the opposing party misappropriated the trade secret.'" <u>Capital Asset Research Corp. v. Finnegan</u>, 160 F.3d 683, 685 (11th Cir. 1998) (quoting <u>Camp Creek Hospitality Inns, Inc. v. Sheraton Franchise Corp.</u>, 139 F.3d 1396, 1410 (11th Cir. 1998)).

i. Whether Trade Secrets Exist

Defendant first argues that the record does not contain evidence that Defendant received any "trade secrets" from Plaintiff.  "Trade secret" is defined as:

> [I]nformation, without regard to form, including, but not limited to, technical or nontechnical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product plans, or a list of actual or potential customers or suppliers which is not commonly known by or available to the public and which information:
>
> (A) Derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

O.C.G.A. § 10-1-761(4).  "Whether a particular type of information constitutes a trade secret is a question of fact." <u>Camp Creek</u>, 139 F.3d at 1410–11.

The plaintiff has "the burden of establishing each of these statutory elements

as to each claimed trade secret." Peat, Inc. v. Vanguard Research, Inc., 378 F.3d 1154, 1158 (11th Cir. 2004).  This means that "a plaintiff who seeks relief for misappropriation of trade secrets must identify the trade secrets and carry the burden of showing that they exist." Rent Info. Tech., Inc. v. Home Depot U.S.A., Inc., 268 F. App'x 555, 557 (9th Cir. 2008) (applying Georgia law).

In this case, Plaintiff has identified, only vaguely at best, its alleged trade secrets.  In its discovery responses, Plaintiff identified 12 general categories of information that it contends constitute trade secrets.  Plaintiff did not identify any specific information it claims is a trade secret.  In its brief in opposition to Defendant's Motion for Summary Judgment, Plaintiff cited five paragraphs of its Statement of Additional Material Facts to identify "the individual trade secrets" it claims were misappropriated.  (See Pl.'s Br. [141] at 22 (citing SAMF ¶¶ 104, 111–112, 115, 123).)[9]  These five paragraphs, like Plaintiff's discovery responses, describe only general categories of information, and do not contain any specific articulation of the specific trade secrets it alleges were misappropriated:

- Plaintiff's "unique underwriting process, financing, marketing, industry concentrations to targeted clients, product development, approach to

---

[9] Plaintiff also cites paragraphs 105, 113, 114, 122, 124, and 125 of its SAMF. These paragraphs discuss Plaintiff's disclosure to Defendant of alleged trade secrets, and they do not identify any additional categories of alleged trade secrets.

recruiting and supporting brokers, varying margins with respect to specific products, default rate and bad debt expense" (SAMF ¶ 104);

- "[A]dditional, focused due diligence requests" (id. ¶ 111);

- "[I]nformation about [Plaintiff's] recruitment of brokers, underwriting, and other areas of its business utilizing unique approaches and processes" (id. ¶ 112);

- "[A]spects" of Plaintiff's business, including "marketing, merchandising, operations, finance, credit and tax" (id. ¶ 115); and

- "[I]ntricate details of [Plaintiff's] business model, including, but not limited to, its go-to-market strategies; ways to go through voluntary benefit brokers to reach the heads of human resources departments with a retail product that would allow employees to purchase items; pricing; product offerings; underwriting; and ways to gain acceptance from human resources departments" (id. ¶ 123).

These broad information categories are not sufficient to meet Plaintiff's legal obligation to allege and prove it has a trade secret. The identification of a "trade secret" is a necessary predicate to alleging and proving that a trade secret was misappropriated. See Capital Asset Research, 160 F.3d at 685–86. Plaintiff's failure to meet its duty to identify what it claims is a trade secret that was

misappropriated precludes Defendant and the Court from evaluating whether a "trade secret" exists and, if so, whether it was misappropriated.  See Luigino's, Inc. v. Peterson, 317 F.3d 909, 912 (8th Cir. 2003) (explaining that, under the Uniform Trade Secrets Act, "general categories of information" cannot constitute trade secrets); Sarkissian Mason, Inc. v. Enter. Holdings, Inc., 955 F. Supp. 2d 247, 255 (S.D.N.Y. 2013) ("General categories of information are insufficiently specific to qualify as trade secrets."); Sun Media Sys., Inc. v. KDSM, LLC, 564 F. Supp. 2d 946, 965 (S.D. Iowa 2008) (explaining that, to satisfy its burden under the Uniform Trade Secrets Act, a plaintiff "cannot rely on generic categories or assertions, but rather must assert *specific* allegations that it possessed information that meets the definition of trade secret").

A critical review of the definition of "trade secret" in O.C.G.A. § 10-1-761(4) underscores why a plaintiff is required to specifically identify the information it alleges is a trade secret under the statute.  Section 10-1-761(4) describes broad categories and types of information that may qualify as a trade secret.  But category kind and type is not enough.  A plaintiff also must allege and show that the claimed information "[d]erives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use"

17

*and* "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." O.C.G.A. § 10-1-761(4). This evaluation is not possible where, as here, Plaintiff has failed over the course of this litigation and in response to the Motion for Summary Judgment, to specifically identify what specific information in the general information categories offered are "trade secrets" under O.C.G.A. § 10-1-761(4). Plaintiff, following months of discovery and after being ordered to do so, has failed to identify the specific trade secrets it claims were misappropriated. Its scattershot of general categories of "trade secrets" is not enough. Defendant is entitled to summary judgment on Plaintiff's trade secret claims for this failure to specify. See Luigino's, 317 F.3d at 912; Sarkissian Mason, 955 F. Supp. 2d at 255; Sun Media, 564 F. Supp. 2d at 965.[10]

---

[10] To support that Plaintiff, on the facts here, cannot show that the claimed "trade secrets" were misappropriated, Defendant has shown that a significant amount of information, falling under the broad categories identified by Plaintiff, was either publicly available or shared by Plaintiff with third-parties. For example, Plaintiff authorized the distribution to potential purchasers of a "teaser" document containing historical and projected sales revenues, profits, and EBITDA and describing Plaintiff's underwriting guidelines based on "salary, tenure and financial stability of [the] employer," "regardless of individual FICO scores." (SUMF ¶ 339; Def.'s Tab 205 [134-7].) Plaintiff does not dispute that this information is not "trade secret" but argues that only "isolated pieces of information" were disclosed in the "teaser" and in other formats, and that more specific information was not disclosed publicly. (See Pl.'s Br. [141] at 19.) Plaintiff, however, does not identify any additional specific information that constitutes its alleged trade secrets. Plaintiff further argues that its alleged trade secrets include the "unique integration" of information that, in individual form,

ii.      Whether Trade Secrets Were "Misappropriated"

Defendant next argues that, even if it acquired information that Plaintiff has shown constitutes Plaintiff's "trade secrets," the undisputed facts here show that no trade secrets were "misappropriated."  A defendant "misappropriates" a trade secret when, among other things, it discloses or uses "a trade secret of another without express or implied consent" knowing at the time of the disclosure or use that the trade secret was "[a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use."  O.C.G.A. § 10-1-761(2)(B); see Kuehn v. Selton & Assocs., 530 S.E.2d 787, 791 (Ga. Ct. App. 2000).  A non-disclosure agreement can be the basis for imposing a duty not to disclose a trade secret.  See Penalty Kick Mgmt. Ltd. v. Coca Cola Co., 318 F.3d 1284, 1292 (11th Cir. 2003).

---

may have been publicly disclosed.  A "unique integration" may qualify as a trade secret if evidence supports there is an integration.  See, e.g., Essex Grp., Inc. v. Southwire Co., 501 S.E.2d 501, 503 (Ga. 1998) (quoting Restatement (Third) of Unfair Competition § 39(f) (1995)) ("The fact that some or all of the components of the trade secret are well-known does not preclude protection for a secret combination, compilation, or integration of the individual elements.").  In this case, however, Plaintiff never identified a "unique integration" as a trade secret at issue. As discussed above, in responses to discovery requests, Plaintiff identified only broad categories of data as its trade secrets and did not identify any integration or combination of information.  Plaintiff may not assert a previously undisclosed trade secret as a basis to deny Defendant's Motion for Summary Judgment.  See Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence on a motion . . . .").

> As a general matter, any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a "use" . . . .  Thus, marketing goods that embody the trade secret, employing the trade secret in manufacturing or production, [and] relying on the trade secret to assist or accelerate research or development . . . all constitute "use."
>
> The unauthorized use need not extend to every aspect or feature of the trade secret; use of any *substantial portion* of the secret is sufficient to subject the actor to liability. . . .  [A]n actor is liable for using the trade secret with independently created improvements or modifications if the result is *substantially derived* from the trade secret. . . .  However, if the contribution made by the trade secret is so slight that the actor's product or process can be said to derive from other sources of information or from independent creation, the trade secret has not been "used" for purposes of imposing liability under the rules.

Id. at 1292–93 (first, second, and fourth omissions and first alteration in original) (quoting Restatement (Third) of Unfair Competition § 40 cmt. c (1995)).  It is well-established that, for a plaintiff to prove that a defendant "misappropriated the trade secret," the plaintiff must "show that the defendant (1) disclosed information that enabled a third party to learn the trade secret or (2) used a 'substantial portion' of the plaintiff's trade secret to create an improvement or modification that is 'substantially derived' from the plaintiff's trade secret." Id. at 1293.

In this case, Plaintiff alleges that Defendant misappropriated its trade secrets by using the trade secrets obtained during the Project Braves due diligence to

develop PayCheck Direct.[11]   Defendant argues that there is not any evidence in the
record to show that Defendant used any portion, and certainly not "a substantial
portion," of Plaintiff's trade secrets to improve or modify PayCheck Direct.
Plaintiff argues that the record contains "circumstantial evidence" of
misappropriation and that this "circumstantial evidence" is sufficient at least to
show a genuine dispute on the issue of misappropriation to require a trial.
Defendant argues that the undisputed direct testimony of its employees, that they
did not use any of Plaintiff's trade secrets in developing PayCheck Direct,
conclusively demonstrates that misappropriation did not occur.

Circumstantial evidence may satisfy the plaintiff's burden to prove trade
secret misappropriation.  See Tronitec, Inc. v. Shealy, 547 S.E.2d 749, 758 (Ga. Ct.
App. 2001), overruled on other grounds by Williams Gen. Corp. v. Stone, 614
S.E.2d 758 (Ga. 2005).  "In ruling on a motion for summary judgment, a finding of
fact that may be inferred from, but is not demanded by, circumstantial evidence has
no probative value against positive and uncontradicted evidence that no such fact
exists, provided that the circumstantial evidence may be construed consistently
with the direct evidence."  White v. Shamrock Bldg. Sys., Inc., 669 S.E.2d 168,

---

[11] Plaintiff does not assert, and the record does not show, that Defendant "disclosed
information that enabled a third party to learn" Plaintiff's alleged trade secrets.

173 (Ga. Ct. App. 2008) (quoting First Citizens Bank of Clayton Cnty. v. All-Lift of Ga., Inc., 555 S.E.2d 1, 3 (2001)); see also Contract Furniture Refinishing & Maint. Corp. of Ga. v. Remfg. & Design Grp., LLC, 730 S.E.2d 708, 714 (Ga. Ct. App. 2012) ("[W]hile [the plaintiff] has produced strong circumstantial evidence that [the defendant] may have used or disclosed its alleged trade secrets, this evidence is also consistent with the direct evidence that [the defendant] did not in fact do so."). Our circuit adopts this same analytical approach. Where there is direct evidence that a defendant did not use or disclose a plaintiff's trade secret, and the plaintiff argues only that there exists circumstantial evidence of misappropriation based on the claimed similarity of the defendant's product to the trade secret, this circumstantial evidence, if consistent with the defendant's direct evidence, is not sufficient to defeat a summary judgment motion. See Penalty Kick, 318 F.3d at 1296. Allowing circumstantial evidence based on the similarity of the defendant's product to defeat direct evidence of non-use offered by the defendant would operate to shift to the defendant the burden to prove non-use of the trade secrets. See id. Such a burden shift is improper. It always is the plaintiff's burden to prove its claims, and if the circumstantial evidence is consistent with the defendant's direct evidence, there is no dispute of fact sufficient

to deny the defendant a grant of summary judgment.  See id.[12]

In this case, Plaintiff relies exclusively on "circumstantial evidence" that Defendant misappropriated Plaintiff's trade secrets to develop Defendant's PayCheck Direct product.  Plaintiff does not specifically identify the "circumstantial evidence" upon which it relies, content with its characterization that PayCheck Direct is an "exact replica" of Purchasing Power.  This generalization about the similarity in the parties' programs, Plaintiff argues, is circumstantial evidence that Defendant used Plaintiff's claimed trade secrets.[13]

---

[12] The analytical framework required to be applied here underscores why Plaintiff is required to identify and specify the trade secrets it claims were misappropriated. In the absence of a specification of the information Plaintiff claims as a "trade secret" under O.C.G.A. § 10-1-764(4), this "circumstantial evidence versus direct evidence" evaluation is difficult to apply.  What is undisputed here is that the direct evidence consists of unequivocal testimony that Plaintiff's information was not used to develop the PayCheck Direct Program.

[13] Plaintiff's brief contains a single hyperbolic sentence describing the alleged circumstantial evidence of misappropriation: "[A]s demonstrated above and in PPL's [SAMF] filed herewith, the circumstantial evidence that Bluestem misappropriated PPL's trade secrets and confidential information is overwhelming . . . ."  (Pl.'s Opp'n [141] at 26.)  The brief does not cross-reference any other section or cite to any SAMF paragraph to direct the Court to what Plaintiff contends constitutes the "circumstantial evidence."  The Court will not scour through the record to find Plaintiff's evidence.  See, e.g., Magnum Towing & Recovery v. City of Toledo, 287 F. App'x 442, 449 (6th Cir. 2008) ("[I]t is not the district court's . . . duty to search through the record to develop a party's claims; the litigant must direct the court to evidence in support of its arguments before the court.").  In the background section of Plaintiff's brief, Plaintiff asserts that PayCheck Direct is an "exact replica" of Purchasing Power and cites to a chart in

The circumstantial evidence Plaintiff asserts here is not enough to support a dispute of facts and is not enough to avoid summary judgment on Plaintiff's trade secret claims.

Defendant offers, as direct evidence, testimony of its employees that Defendant did not incorporate, or otherwise use, claimed confidential information or trade secrets about Purchasing Power in developing PayCheck Direct.  (See, e.g., SUMF ¶ 125.)  Defendant also submitted direct evidence detailing its development of PayCheck Direct.  This evidence shows that, in late July 2010, Defendant launched its Project Cortes to develop a payroll deduction program for the sale of "big ticket" items.  Defendant staffed Project Cortes with employees with diverse business backgrounds, including experience in the extension of credit, underwriting, marketing, and merchandising.  Over the course of many months, the Project Cortes team researched various aspects of the payroll deduction sales model.[14]  Fifteen months later, in November 2011, Defendant launched a "beta"

the SAMF comparing the two products.  (Pl.'s Opp'n [141] at 12 (citing SAMF[146] ¶ 215).)  The chart shows both similarities and differences between the products.  The Court infers that Plaintiff's purported "circumstantial evidence" includes the similarities described in this chart.

[14] For example, Project Cortes's manager met with employee benefits brokers to determine that a 7% broker commission would make PayCheck Direct "competitive."  (SUMF ¶ 253.)

version of its PayCheck Direct among its employees.  In May 2012, Defendant

launched its final version of the program, and then began marketing it to outside

clients.

The final version of PayCheck Direct had both several similarities to and

differences from Plaintiff's Purchasing Power.  For example, while both products

offer broker commissions of "7% (up to 9%)," PayCheck Direct's and Purchasing

Power's respective "spending limits as a percentage of income" were different—

specifically, PayCheck Direct's "spending limit as a percentage of income" was

3% to 3.5%, whereas Purchasing Power's was 6.5% to 7.5%.  (SAMF ¶ 215.)[15]

The evidence of Defendant's development of PayCheck Direct is consistent with

the ultimate launch of a product with these similarities to and differences from the

Purchasing Power product, and the evidence directly shows that Plaintiff's trade

secrets were not used.[16]  Circumstantial evidence, consisting of the product

similarities suggested by Plaintiff, is not sufficient to support that there exists a

---

[15] Additional differences, as shown in Plaintiff's chart, included the number of
SKUs, the assumed participation rate, the assumed loss ratio, the average order
size, and the spending limit as a percentage of income.  (SAMF ¶ 215.)

[16] Plaintiff has not submitted any evidence showing any particular similarity in the
products that could only have resulted from misappropriation of trade secrets.
Plaintiff simply asserts that PayCheck Direct is an "exact replica" of Purchasing
Power based on a chart showing both similarities and differences between the
products.

genuine dispute of material facts over whether Defendant misappropriated

Plaintiff's trade secrets.  For this additional reason, Defendant is entitled to

summary judgment on Plaintiff's trade secret misappropriation claims.

        2.    *Breach of Contract*

        i.    Section 4 of the NDA: Use of Confidential Information

Plaintiff alleges that Defendant breached Section 4 of the NDA by using

Plaintiff's confidential information in developing Defendant's PayCheck Direct

product.  Defendant argues that Plaintiff has failed to present record evidence that

Defendant used Plaintiff's confidential information.  Plaintiff asserts that the same

generalized, unidentified "circumstantial evidence" to support its argument for its

trade secret claim also supports its NDA Section 4 claim.  As explained above, the

circumstantial evidence upon which Plaintiff relies is not sufficient to show that

Defendant "used" any of Plaintiff's trade secrets, or other confidential information,

and Defendant is entitled to summary judgment on the NDA Section 4 claim.  See

Omnitech Int'l, Inc. v. Clorox Co., 11 F.3d 1316, 1327 (5th Cir. 1994).

        ii.    Section 6 of NDA: Failure to Allow Inspection

Plaintiff next alleges that Defendant breached Section 6 of the NDA by

failing to permit Plaintiff to review Defendant's operations to ensure compliance

with the NDA.  Defendant argues that it also is entitled to summary judgment on

this claim because the record does not contain evidence that Plaintiff suffered any damage as a result of this alleged breach.  The parties agree that Minnesota law governs the NDA, and under Minnesota law a claim for breach of contract requires proof of actual damages.  See, e.g., Reuter v. Jax Ltd., Inc., 711 F.3d 918, 920 (8th Cir. 2013) ("[U]nder Minnesota law, '[a] breach of contract claim fails as a matter of law if the plaintiff cannot establish that he or she has been damaged by the alleged breach.'" (quoting Jensen v. Duluth Area YMCA, 688 N.W.2d 574, 578–79 (Minn. Ct. App. 2004))).

The only damage Plaintiff addresses in its submissions to the Court is "in the nature of attorneys' fees and costs."  (Pl.'s Br. [141] at 31.)  Plaintiff has not presented any record evidence to support that it incurred any attorneys' fees and costs or, if so, in what amount.  For this reason alone, Plaintiff has failed to show evidence to support the existence of damages, and there being no disputed fact on this damage issue, Defendant is entitled to summary judgment on Plaintiff's NDA Section 6 claim.  See Owen v. Wille, 117 F.3d 1235 (11th Cir. 1997) (explaining that, in opposing a summary judgment motion, Rule 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." (quoting Celotex Corp. v. Catrett, 477 U.S.

317, 324 (1986))); see also Travaglio v. Am. Express Co., 735 F.3d 1266, 1269

(11th Cir. 2013) ("[A] sentence in an unsworn brief is not evidence.").  Even if the

Court considered Plaintiff's "attorneys' fees and costs" damage claim, Minnesota

law does not allow the recovery of litigation expenses in contract cases unless the

contract expressly provides for such recovery.  See Barr/Nelson, Inc. v. Tonto's,

Inc., 336 N.W.2d 46, 53 (Minn. 1983) ("We have long held that attorney fees are

not recoverable in litigation unless there is a specific contract permitting or a

statute authorizing such recovery.").  It is undisputed that the NDA does not

provide for the recovery of litigation expenses, and for this further reason

Defendant is entitled to summary judgment on the NDA Section 6 claim.

> 3.    *Affirmative Fraud and Negligent Misrepresentation*

The torts of affirmative fraud and negligent misrepresentation require, under

Georgia law, the communication by a defendant of a false representation to a

plaintiff.  Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc., 496 F.3d

1231, 1250 (11th Cir. 2007); Home Depot U.S.A., Inc. v. Wabash Nat'l Corp., 724

S.E.2d 53, 60 (Ga. Ct. App. 2012).  Plaintiff alleges that Defendant is liable for

fraud and negligent misrepresentation because Defendant's executives told

Plaintiff's executives, before and during the course of the Project Braves due

diligence, that they were unfamiliar with Plaintiff's business model, that they did

not have a program similar to Purchasing Power, and that they had never before considered such a program.  Defendant does not dispute that its executives made the alleged statements but asserts that the statements are not false.  Defendant specifically asserts that the statements made pertain to the executives' beliefs before they first learned of Plaintiff's Purchasing Power product.

Plaintiff has not cited to any evidence in the record that the statements were factually and actually false.  Plaintiff now claims that its executives understood Defendant's executives' statements to mean that Defendant did not consider a program like Purchasing Power "other than in the context of a potential acquisition of" Plaintiff.  (See Pl.'s Br. at 32 (citing Resp. SUMF ¶ 133).)  This new articulation of the claim is not properly before the Court (i) because it was asserted only in Plaintiff's Response to Defendant's Statement of Undisputed Facts, and it was not asserted in Plaintiff's Statement of Additional Material Facts, and (ii) because the deposition excerpt cited in Plaintiff's Response to Defendant's Statement of Undisputed Facts does not support Plaintiff's now asserted understanding of Defendant's executives' statements.  This newly claimed interpretation also does not support that Defendant's executives' statements were factually false.  In Optimum Technologies, a product distributor intended to stop distributing a manufacturer's product and to distribute, instead, its own competing

29

product.  496 F.3d at 1250.  The distributor told the manufacturer that it was planning to change the "packaging" of the product.  Id.  This statement was literally true because the new packaging would reflect the new product.  Id.  The Eleventh Circuit held that the distributor's statement did not support a claim for fraud or negligent misrepresentation, even if the manufacturer misunderstood the significance of the packaging change, because the statement was literally true.  Id.  In this case, despite Plaintiff's alleged misunderstanding of Defendant's statements, Plaintiff did not produce any evidence to show that the statements are not literally true.  Defendant is entitled to summary judgment on Plaintiff's affirmative fraud and negligent misrepresentation claims.  See id.

    4.   *Fraudulent Omission*

Plaintiff alleges that Defendant is liable for fraudulently failing to disclose to Plaintiff during the Project Braves due diligence that Defendant was conducting Project Cortes.  The omission of a fact may form the basis of a fraud if the omitting party is under an obligation to communicate the fact.  O.C.G.A. § 23-2-53.  Defendant argues that it was not obligated to disclose Project Cortes to Plaintiff.

"The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case."  Id.  This generally requires the parties to have a confidential or fiduciary relationship.  See Optimum

30

Techs., 496 F.3d at 1249.[17]   The Eleventh Circuit has explained that

> Generally speaking, "business relationships are not confidential
> relationships," nor is "[t]he mere fact that one [party] reposes trust and
> confidence in another's integrity."  Rather, in order for a business
> arrangement between two parties to rise to the level of a confidential
> relationship, it must be shown either that the parties have a long
> history with each other, or that the arrangement was not at "arm's
> length," but was in the nature of a legal partnership or a joint venture.
> A confidential relationship does not arise, however, where the
> business transaction is merely an arrangement in which each party is
> "attempting to further [its] own separate business objectives," rather
> than entering into some sort of joint venture.

Id. (alterations in original) (citations omitted) (quoting Williams v. Dresser Indus.,

Inc., 120 F.3d 1163, 1168 (11th Cir.1997)).

The record in this case supports that the parties did not have "a long history

with each other" and were not engaged in a "legal partnership or a joint venture."

See id.  The Project Braves due diligence was the parties' first interaction and a

predicate to a possible relationship.  The purpose of the due diligence was to assist

---

[17] Georgia courts have recognized that, in the absence of a confidential
relationship, a duty to disclose may arise under the "particular circumstances of the
case" when the defendant is shown to have (1) intentionally concealed a
fact (2) for "the purpose of obtaining an advantage or a benefit."  See Ga. Real
Estate Comm'n v. Brown, 262 S.E.2d 596, 597 (Ga. Ct. App. 1979) (citing Reeves
v. B.T. Williams & Co., 127 S.E. 293, 295 (Ga. 1925)).  Plaintiff has not argued
that this situation applies here, and the record, which does not support that
Defendant used any of Plaintiff's trade secrets or confidential information, does
not otherwise contain evidence that Defendant concealed Project Cortes "for the
purpose of obtaining an advantage or a benefit."  See id.

Defendant in determining whether to make an offer to purchase Plaintiff's business, not to decide if Defendant would enter into a joint business venture with Plaintiff. "Parties negotiating the sale of a business 'are not, by virtue of their status as such, placed in a confidential relationship to each other but are presumed to be dealing at arm's length." Infrasource, Inc. v. Hahn Yalena Corp., 613 S.E.2d 144, 147 (Ga. Ct. App. 2005) (quoting William Goldberg & Co., v. Cohen, 466 S.E.2d 872, 881 (Ga. Ct. App. 1995). The NDA does not impose any disclosure obligation on Defendant. In it, "the parties specifically acknowledge and agree that both [Defendant] and [Plaintiff] are engaged in competitive businesses." (SUMF ¶ 98.)[18] The record does not support that Defendant was obliged to disclose Project Cortes to Plaintiff, and Defendant is entitled to summary judgment on Plaintiff's fraudulent omission claims.

### 5.   *Tortious Interference*

In Counts VI and VII of the Amended Complaint, Plaintiff asserts, for the first time, claims for tortious interference with contractual relations and tortious

---

[18] Plaintiff argues that it would not have shared its confidential information with Defendant if it had been aware of Project Cortes. This unilateral position does not convert the parties' relationship into a confidential one or a joint venture. See Optimum Techs., 496 F.3d at 1249 (explaining that "[t]he mere fact that one [party] reposes trust and confidence in another's integrity" is not sufficient to create a confidential relationship).

interference with business relations.  These claims were not asserted in the Original Complaint, and they are distinct from Plaintiff's fraud and negligent misrepresentation claims.

Rule 15(a) of the Federal Rules of Civil Procedure allows a plaintiff to file one amended complaint as a matter of course, if the amended complaint is filed either within 21 days of service of the original complaint or within 21 days of the defendant's filing of a responsive pleading or Rule 12 motion to dismiss.  See Fed. R. Civ. P. 15(a)(1).  Amended complaints outside of these time limits may be filed only "with the opposing party's written consent or the court's leave."  See Fed. R. Civ. P. 15(a)(2).  There is no dispute that the filing of the Amended Complaint here required Defendant's consent or leave of the Court.  The Court, in its July 27, 2012, Order of dismissal, granted Plaintiff leave to file the Amended Complaint "to address the pleading shortcomings identified" in the Original Complaint— specifically, the failure to plead fraud and negligent misrepresentation "with particularity" as required by Rule 9(b).  Plaintiff did not seek, and the Court did not grant, leave to assert any other claims, including claims for tortious interference.[19]

---

[19] The addition of these claims also violates the Preliminary Report and Discovery Plan (the "Plan") filed by the parties on March 2, 2012, and approved by the Court on March 5, 2012.  The Plan required any amendments to the pleadings to be filed not "LATER THAN THIRTY (30) DAYS after the [Plan] [was] filed."  (Plan [19] ¶ 6(b), at 17.)  Plaintiff further stated in the Plan that it did "not anticipate any

Defendants did not consent to allow Plaintiff to assert Counts VI and VII in this case.  Counts VI and VII of the Amended Complaint thus are required to be dismissed.[20]  As a result, Defendant's Motion for Summary Judgment on these Counts is denied as moot.[21]

## III.   CONCLUSION

Accordingly, for the foregoing reasons,

**IT IS HEREBY ORDERED** that Counts VI and VII of Plaintiff's Amended Complaint are **DISMISSED** for failure to comply with Rule 15(a)(2) of the Federal Rules of Civil Procedure.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary

---

amendments to the Complaint at this time, absent instruction from the Court in connection with Defendant's pending motions to dismiss."  (Id. ¶ 6(a), at 17.)  The leave to amend granted here did not include leave to assert the claims in Counts VI and VII of the Amended Complaint.

[20] In its opposition, Plaintiff asserts that the Court "likely would have" granted leave to assert the tortious interference claims if Plaintiff had actually moved for leave.  Rule 15, however, requires Plaintiff to have actually sought leave to amend.  Plaintiff did not, and Defendant was never afforded the opportunity to respond to such a request.  The Court further notes that, in its April 17, 2013, Order [87], the Court specifically noted the impropriety of Counts VI and VII of the Amended Complaint.  Plaintiff nevertheless chose not to then, or subsequently, seek leave to properly assert Counts VI and VII.

[21] Because the Court has concluded that Defendant is entitled to summary judgment on all the remaining claims, Plaintiff's Motion for Trial by Jury is moot and is denied on that basis.

Judgment [127] is **GRANTED IN PART** and **DENIED AS MOOT IN PART**.  It is **DENIED AS MOOT** with respect to Counts VI and VII of Plaintiff's Amended Complaint.  It is **GRANTED** with respect to all remaining claims.

    **IT IS FURTHER ORDERED** that Plaintiff's Motion for Trial by Jury [155] is **DENIED AS MOOT**.

    **SO ORDERED** this 9th day of May, 2014.

_____
·WILLIAM S. DUFFEY, JR.
·UNITED STATES DISTRICT JUDGE