```
 1                IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF GEORGIA
 2                        ATLANTA DIVISION

 3    PURCHASING POWER, LLC            )
                                       )
 4              Plaintiff              )    CIVIL ACTION FILE
                                       )    NO. 1:12-CV-258-WSD
 5    v.                               )
                                       )    ATLANTA, GEORGIA
 6    BLUESTEM BRANDS, INC.            )
                                       )
 7              Defendant.             )
      _____)

 8

 9                  TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE WILLIAM S. DUFFEY, JR.,
10                UNITED STATES DISTRICT JUDGE

11               Wednesday, August 20, 2014

12

      APPEARANCES OF COUNSEL:
13
      For the Plaintiff:      BURR & FORMAN LLP
14                            (By:  Elizabeth Bosquet Shirley
                                    Joseph W. Letzer
15
                              STRICKLAND BROCKINGTON LEWIS LLP
16                            (By:  Oscar N. Persons)

17
      For the Defendant:      FAEGRE BAKER DANIELS LLP
18                            (By:  Randall E. Kahnke
                                    Kerry L. Bundy
19                                  Jeffrey P. Justman
                                    Erin M. Verneris)
20
                              KILPATRICK TOWNSEND & STOCKTON LLP
21                            (By:  George L. Murphy, Jr.
                                    Audra Ann Dial)
22

23
             Proceedings recorded by mechanical stenography
24            and computer-aided transcript produced by
                    NICHOLAS A. MARRONE, RMR, CRR
25                        (404) 215-1486
```

```
1                    I N D E X

2    Witness                           Page

3    Richard Alfred Carrano, II
           Direct (By Ms. Shirley)       5
4          Cross (By Mr. Kahnke)         36
           Redirect (By Ms. Shirley)     72
5          Recross (By Mr. Kahnke)       75

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    Wednesday Morning Session

2                        August 20, 2014

3                          10:01 a.m.

4                          -- -- --

5                 P R O C E E D I N G S

6                          -- -- --

7          (In open court:)

8          THE COURT:  Good morning.  This is an evidentiary

9   hearing on the Court's August 7th, 2014, order following the

10  Eleventh Circuit's limited remand for a factual determination

11  on the citizenship of the members of Purchasing Power L.L.C.,

12  which is the plaintiff in this case.

13          In my order I ordered the parties to explain the

14  representations that were made to the Court regarding

15  Purchasing Power's citizenship and the Court's jurisdiction,

16  and there are at least two representations on which the Court

17  requires information.

18          First, the representation that was made in the

19  notice of removal in this case that the defendant Bluestem's

20  citizenship was diverse from Purchasing Power's citizenship

21  because Purchasing Power was not a citizen of either

22  Minnesota or Delaware.

23          And then, second, the plaintiff's representation in

24  the preliminary report and discovery plan that there was no

25  question as to the Court's jurisdiction over this matter.
```

1    And I want to know the basis for that representation.

2          So that is the purpose of the hearing.  Would

3    counsel please announce their appearances so that we can

4    begin?

5          MR. PERSONS:  Your Honor, may it please the Court,

6    Oscar Persons.  I'm happy to introduce my former colleagues

7    at Burr Forman in the Birmingham office, Elizabeth Shirley

8    and Joe Letzer.  Ms. Shirley will be handling the matters for

9    the plaintiff this morning.

10         THE COURT:  Thank you.  Good morning.

11         MS. SHIRLEY:  Good morning.

12         MS. DIAL:  Good morning, Your Honor.  Audrey Dial

13   with Kilpatrick Townsend on behalf of Bluestem Brands.  With

14   me today are my co-counsel Randy Kahnke and Kerry Bundy, and

15   Randy will be arguing today.  Jeff Justman with the Faegre

16   firm as well is here.

17         THE COURT:  Thank you.

18         Let's begin with the presentation of evidence on

19   Purchasing Power's citizenship of its members and who its

20   members are.

21         MS. SHIRLEY:  I good morning, Your Honor.  May it

22   please the Court, my name is Elizabeth Shirley and

23   I represent the plaintiff, Purchasing Power L.L.C.

24         We have the President and CEO of Purchasing Power

25   L.L.C. here today.  His name is Mr. Richard Carrano, and he

1    is prepared to testify, if that would please the Court.

2                THE COURT:  It would.  Please call him.

3                MS. SHIRLEY:  Okay.  Mr. Carrano?

4                        --   --   --

5                    RICHARD ALFRED CARRANO, II

6       being first duly sworn by the Courtroom Deputy Clerk,

7                    testifies and says as follows:

8                        --   --   --

9                        DIRECT EXAMINATION

10   BY MS. SHIRLEY:

11   Q.    Mr. Carrano, would you please state your name for the

12   record?

13   A.    It is Richard Alfred Carrano, II.

14   Q.    And by whom are you employed?

15   A.    Purchasing Power L.L.C.

16   Q.    What is your position with Purchasing Power L.L.C.?

17   A.    I am the President and Chief Executive Officer.

18   Q.    How long have you held those positions?

19   A.    Since October 14th, 2011.

20   Q.    So was that before the instant lawsuit was filed?

21   A.    It is.

22   Q.    What are generally your duties and responsibilities as

23   the President and CEO of Purchasing Power?

24   A.    I lead our strategy development, and all of the

25   executive team of the company report to me, and I manage the

1    execution then of the business model.

2    Q.    Are you an attorney?

3    A.    I am not.

4    Q.    Do you have any legal training?

5    A.    I do not.

6    Q.    Were you involved in setting up the legal structure of

7    Purchasing Power L.L.C.?

8    A.    I was not.

9              MS. SHIRLEY:  I am going to mark as Plaintiff's

10   Exhibit 1 a filed copy of Purchasing Power L.L.C.'s verified

11   complaint in state court in this matter, if it would please

12   the Court?

13             THE COURT:  Isn't that a matter of record already,

14   or do you just want to refresh his memory as to the claims

15   that were brought?

16             MS. SHIRLEY:  It is a matter of record, yes,

17   Your Honor.

18             THE COURT:  Any objection?

19             MR. KAHNKE:  No, Your Honor.

20             THE COURT:  It is admitted.

21             MS. SHIRLEY:  Thank you.  May I approach?

22             THE COURT:  You may.

23   BY MS. SHIRLEY:

24   Q.   Mr. Carrano, would you please identify what's been

25   marked as Plaintiff's Exhibit 1?

1    A.    This appears to be the -- I guess the complaint that was

2    filed in state court regarding the matter between Purchasing

3    Power L.L.C. and Bluestem Brands.

4    Q.    Did you authorize the filing of this complaint in state

5    court?

6    A.    I did, yes.

7    Q.    And the plaintiff's chosen forum was state court in

8    Georgia, not federal court; is that right?

9    A.    Yes.

10   Q.    And did you review the complaint before it was filed?

11   A.    I did.

12   Q.    Did you verify it?

13   A.    I did.

14   Q.    And is there only one plaintiff in the complaint?

15   That's Purchasing Power L.L.C.; is that right?

16   A.    Yes.

17   Q.    Are you familiar with correspondence between counsel for

18   Bluestem, Mr. Randy Kahnke, who is here today, and counsel

19   for Purchasing Power, Mr. Joe Letzer, who is here today?

20   A.    I am.

21         MS. SHIRLEY:  Your Honor, I would like to mark as

22   Plaintiff's Exhibit 2 an e-mail exchange between Mr. Kahnke

23   and Mr. Letzer.  May I approach?

24         THE COURT:  Have you shown that to counsel?

25         MS. SHIRLEY:  Yes.  Would you like a copy?

```
 1              THE COURT:  I would.
 2              MS. SHIRLEY:  Okay.
 3   BY MS. SHIRLEY:
 4   Q.   Mr. Carrano, have you seen Plaintiff's Exhibit 2 before
 5   today?
 6   A.   I have.
 7   Q.   Could you identify it for me?
 8   A.   It is correspondence between defendant counsel and
 9   plaintiff counsel.
10   Q.   Okay.  And is it regarding the resident citizens of
11   Purchasing Power L.L.C.?
12   A.   It is.
13   Q.   If you will turn to the second page of Plaintiff's
14   Exhibit 2 for me?
15              THE COURT:  Is there any objection to Exhibit 2?
16              MR. KAHNKE:  No, Your Honor.
17              THE COURT:  It's admitted.
18   BY MS. SHIRLEY:
19   Q.   About a fourth of the way down the page there is an
20   e-mail from Mr. Kahnke to Mr. Letzer.  Do you see that?
21   A.   I do.
22   Q.   Could you read the text of that e-mail for me, please?
23   A.           Joe, I am following up on my message
24           below.  Can you please let me know whether your
25           client will provide information about its ownership
```

1          structure and the states of residence of its

2          members.

3               If you have any questions or would like to

4          discuss, please feel free to contact me.   Thanks,

5          Randy.

6   Q.   And was that message forwarded on to you by Mr. Letzer?

7   A.   It was.

8   Q.   And what did you do in response to the request by

9   Mr. Kahnke?

10  A.   I prepared a list of members with the states of

11  residence for those members.

12  Q.   What materials did you review to prepare that list?

13  A.   Documents from the sale transaction that had occurred

14  back in October of 2011, and specifically the unit purchase

15  and recapitalization agreement.

16  Q.   Could you briefly describe the sales transaction for the

17  Court to which you are referring?

18  A.   Yes.   The predecessor company, Purchasing Power L.L.C.,

19  was -- essentially majority assets were acquired in the

20  transaction considered a recapitalization.   The majority

21  owners of the predecessor company exited the ownership

22  structure.

23       Two entities, known to us as Rockbridge and Falcon,

24  essentially provided the majority of capital for that

25  transaction.   Some of the predecessor members, myself

1    included, rolled over equity into the new co.

2        And so Bluestem -- or, sorry, Rockbridge, Falcon and

3    rollover shareholders as well as one of our majority owners,

4    Stephens Capital Partners, became the new owners of the

5    Purchasing Power L.L.C. through a holding company called

6    Purchasing Power Holdings L.L.C.

7    Q.    And is the title of that document --

8              THE COURT:   At some point are we actually going to

9    get to my question as to what was the citizenship of the

10   members of the L.L.C. at the time of removal?

11             MS. SHIRLEY:   Absolutely, Your Honor.

12             THE COURT:   Can we get to that sooner rather than

13   later?

14             MS. SHIRLEY:   I will speed it up, yes.

15   BY MS. SHIRLEY:

16   Q.    Mr. Carrano, I am going to show you what I have marked

17   as Plaintiff's Exhibit 3, and I would like to ask you whether

18   it is a list of the members of Purchasing Power that you

19   compiled pursuant to Mr. Kahnke's request and the state of

20   residence.

21             MS. SHIRLEY:   May I approach, Your Honor?

22             THE COURT:   You may.   Have you shown that to

23   opposing counsel?

24             MS. SHIRLEY:   Yes, Your Honor.

25             MR. KAHNKE:   Thank you.

BY MS. SHIRLEY:

Q.   Mr. Carrano, is Plaintiff's Exhibit 3 a true and correct copy of the chart that you testified you prepared in response to Mr. Kahnke's question regarding the members of Purchasing Power and their states of residence?

A.   Yes, it is.

Q.   Now, when you -- I assume you provided this chart to Mr. Letzer; is that correct?

A.   I did.

Q.   And when you provided it to Mr. Letzer, was it around the time of the correspondence that is reflected in Plaintiff's Exhibit 2, in the January 2012 time frame?

A.   It was.

Q.   All right.  And when you provided Plaintiff's Exhibit 3, did you believe it was true and correct to the best of your ability and understanding?

A.   I did.

Q.   And as you sit here today, do you believe that it is true and accurate?

A.   It is not accurate.

Q.   Okay.  What is inaccurate about Plaintiff's Exhibit 3?

A.   The second entry of members, FSP III Kendrick Purchasing Power Holdings L.L.C., is incorrectly identified as well as the state of residence for them.

Q.   And what should be one of the members of Purchasing

1    Power L.L.C. instead of FSP III Kendrick Purchasing Power

2    Holdings L.L.C. in Massachusetts?

3    A.   It should reflect FSP III Kendrick Purchasing Power

4    Holdings, Inc., and the state of residency should be

5    Delaware.

6    Q.   And is it your understanding that Bluestem Brands, the

7    defendant in this case, is a citizen of the states of

8    Delaware and Minnesota?

9    A.   Yes.

10   Q.   Okay.  But plaintiff did not want to have this case

11   filed in federal court.  It chose state court; correct?

12   A.   We did file in state court.

13   Q.   But nonetheless, it was your good faith belief in

14   January of 2012 that Plaintiff's Exhibit 3 was in fact the

15   citizenship of Purchasing Power's members; is that right?

16   A.   Yes.

17             THE COURT:  That's not what he said of this

18   document, so please don't mischaracterize his testimony.

19             MS. SHIRLEY:  I apologize, Your Honor.  I will try

20   not to.

21             THE COURT:  I know you are trying to make a record,

22   but I want a truthful one.

23             MS. SHIRLEY:  Absolutely, I understand.  I

24   apologize.

25             Would Your Honor like to hear about how the mistake

1      came about?

2             THE COURT:  I want to hear from him what he did to

3      prepare this and how he didn't even know at the time that one

4      of its members was a corporation as opposed to a listed

5      L.L.C.

6             So you could elicit from him the steps that he took

7      factually to make these representations.

8      BY MS. SHIRLEY:

9      Q.   Mr. Carrano --

10            THE COURT:  And I want to know specifically what

11     his lawyer told him to prepare, which is different than the

12     representation that was made on this January 20th e-mail.

13            MS. SHIRLEY:  Okay.

14     BY MS. SHIRLEY:

15     Q.   Mr. Carrano, without waiving the attorney-client

16     privilege, which I would not -- which I do not want to do,

17     do you recall what Mr. Letzer discussed with you back in

18     January 2012 regarding what to prepare?

19     A.   Nothing other than a list of the members and the

20     residency of them.

21     Q.   Did he ask you to prepare what is set out in

22     Mr. Kahnke's e-mail, which is Plaintiff's Exhibit 2?

23     A.   Yes.

24     Q.   And did you try your best to do that?

25     A.   I did.

1   Q.   Okay.  And I believe you testified that you looked to

2   the sale document or the unit purchase and recapitalization

3   agreement to come up with the list of members; is that

4   correct?

5   A.   I did.

6        MS. SHIRLEY:  Your Honor, I would like to

7   introduce as Plaintiff's Exhibit 4 the unit purchase and

8   recapitalization agreement that Mr. Carrano reviewed.  It is

9   also Exhibit 99 in the depositions that were taken in this

10  case.

11       THE COURT:  Any objection?

12       MR. KAHNKE:  No, Your Honor.

13       THE COURT:  It's admitted.

14       MS. SHIRLEY:  Your Honor, I apologize, this is a

15  very large document.

16       THE COURT:  Is there any objection to Exhibit 3

17  being admitted, which I assume plaintiff wants to do?

18       MR. KAHNKE:  No.  I think just to make sure we are

19  on the same page, I may have misheard, but I think this was

20  Exhibit 99 --

21       MS. SHIRLEY:  Correct.

22       MR. KAHNKE:  -- from the deposition, and I think

23  it's Exhibit 4 today?

24       MS. SHIRLEY:  Correct.

25       MR. KAHNKE:  No objection, Your Honor.

```
 1              THE COURT:  Exhibits 3 and 4 are admitted.
 2              MS. SHIRLEY:  Thank you, Your Honor.
 3   BY MS. SHIRLEY:
 4   Q.   Mr. Carrano, if you would, would you please turn to page
 5   PPL --
 6              THE COURT:  Look, I don't want you to build the
 7   record that you want to build.
 8              MS. SHIRLEY:  Okay.
 9              THE COURT:  I want you to ask him to state what he
10   did.
11              MS. SHIRLEY:  Okay.
12   BY MS. SHIRLEY:
13   Q.   Mr. Carrano, please tell me what you did with respect to
14   the UPRA in order to -- and by UPRA, I mean the unit purchase
15   and recapitalization agreement -- to come up with the chart
16   that is Plaintiff's Exhibit 3?
17              THE COURT:  Here is what I want you to do, and
18   I will do this examination myself if I have to.  Ask him
19   what he did to prepare this list, and what specifically,
20   whether it's this or other documents, he looked at to
21   determine what the membership citizenship was of each
22   member of the L.L.C.
23              MS. SHIRLEY:  Okay.
24   BY MS. SHIRLEY:
25   Q.   Mr. Carrano, what did you do to prepare Plaintiff's
```

1   Exhibit 3?

2   A.   So in looking at the unit purchase and recapitalization

3   agreement -- the concept of residence and citizenship is a

4   foreign one to me, and as such I interpret that to mean

5   physical location.

6       So within the unit purchase and recapitalization

7   agreement, there is a section on page 56 for notices.  So

8   I looked to that section of the UPRA to identify who and

9   where the individuals party to this agreement would reside.

10      And so on page 56, what I now believe to be a typo,

11  identifies FSP III Kendrick Purchasing Power Holdings

12  L.L.C. as opposed to Inc. as a Boston, Massachusetts,

13  location.

14  Q.   So you had looked to page 56 of Plaintiff's Exhibit 4 in

15  order to in part come up with a chart that is Plaintiff's

16  Exhibit 3?

17  A.   In the context of understanding residence as

18  I understand it as a business person.

19  Q.   Okay.  Now, does the UPRA also have references to

20  FSP III Kendrick Purchasing Power Holdings, Inc. --

21  A.   It does.

22  Q.   -- the Delaware corporation?

23  A.   It does.

24  Q.   But your testimony is you went to page 56 and included

25  FSP III Kendrick Purchasing Power Holdings L.L.C. on the

1  chart?

2  A.   I did.

3  Q.   And you believed at the time that that was a member of

4  Purchasing Power; is that right?

5  A.   I did.

6  Q.   Okay.  Are there any other inaccuracies in Plaintiff's

7  Exhibit 3?

8  A.   I don't believe so.

9  Q.   Do you recall when Plaintiff's Exhibit 4 was produced in

10  this litigation?

11  A.   January 2013, I believe.

12  Q.   Was that before depositions started?

13  A.   It was.  Slightly before.

14         MS. SHIRLEY:  I would like to mark as Plaintiff's

15  Exhibit 5 another document, and it is entitled Project Tarpon

16  Information, and it was produced by Stephens in this case.

17         THE COURT:  Well --

18         MS. SHIRLEY:  It was produced from Stephens' files

19  in this case, 17785.

20         Your Honor, may I approach?

21         THE COURT:  You may.

22  BY MS. SHIRLEY:

23  Q.   Mr. Carrano, are you familiar with Plaintiff's Exhibit

24  5?

25  A.   I am.

```
1    Q.   And if you will turn to the second physical page, could

2    you tell me what it reflects as the members of Purchasing

3    Power L.L.C.?

4    A.   It reflects that an entity here identified as Holdings

5    is the 100 percent member of Purchasing Power L.L.C.  And

6    then there are four members of Holdings which include

7    Purchasing Power Investors L.L.C., FSP III Kendrick

8    Purchasing Power Holdings, Inc., Stephens Purchasing Power

9    L.L.C., and then individual members which reflect predecessor

10   entity members who rolled over into the new co.

11   Q.   Was this document, Plaintiff's Exhibit 5, which is Bates

12   Stamped Stephens, in your personal files when you were

13   compiling Plaintiff's Exhibit 3?

14   A.   It was.

15   Q.   And was it maintained by Stephens, though?

16   A.   All equity holders of the transaction likely had a copy

17   of this.

18              MS. SHIRLEY:  Okay.  I am going to mark as

19   Plaintiff's Exhibit 6 -- and I don't even know if I need to

20   mark it, Your Honor.  It is the joint preliminary report and

21   discovery plan that was filed in this case.

22              THE COURT:  It's on the docket.  I have reviewed

23   it.

24              MS. SHIRLEY:  I will not mark it.

25              THE COURT:  Who signed that, by the way, on behalf
```

1    of your firm?

2              MS. SHIRLEY:  Ashby Kent, who is off on maternity

3    leave.  She had a baby last week.

4              May I approach the witness?

5              THE COURT:  You may.

6              MS. SHIRLEY:  Would Your Honor like a copy?

7              THE COURT:  I have seen it.

8    BY MS. SHIRLEY:

9    Q.   Mr. Carrano, are you familiar with the joint preliminary

10   report and discovery plan?

11   A.   I am.

12   Q.   And did you review it before it was filed?

13   A.   I did.

14   Q.   If you will turn to page 15 for me, Paragraph 4, it

15   states, Jurisdiction:  Is there any question regarding this

16   Court's jurisdiction?  And there is a yes per defendant and a

17   no per plaintiff.  Are you familiar with that?

18   A.   I am.

19   Q.   When you reviewed it, did you believe that was accurate

20   based on the information that you had in your files and what

21   you knew?

22   A.   I did.

23             THE COURT:  And it's clear that the information in

24   his file includes this Purchasing Power post closing equity

25   ownership structure; is that correct?

```
1            MS. SHIRLEY:  The Stephens document?

2            THE COURT:  Yes.

3            MS. SHIRLEY:  Yes, that is part of discovery in

4   this case and it was produced on --

5            THE COURT:  And he's testified that was in his

6   personal file; correct?

7            MS. SHIRLEY:  Was that in your personal file,

8   Mr. Carrona?

9            THE COURT:  He's testified that it was in his

10  personal file in response to the question that you asked.

11           THE WITNESS:  Yeah, I had a copy of it, and again

12  it was a preliminary draft as identified by the brackets in

13  there.   But, yes.

14           THE COURT:  What's that exhibit number?  I think

15  that you have neglected to introduce that.

16           MS. SHIRLEY:  I'm sorry, I will introduce it.  It

17  is Plaintiff's Exhibit 5.

18           THE COURT:  Any objection?

19           MR. KAHNKE:  No objection, Your Honor.

20           THE COURT:  It's admitted.

21  BY MS. SHIRLEY:

22  Q.   Based on your review of the UPRA, which you have

23  before you, why did you include on Plaintiff's Exhibit 3

24  the chart that you prepared the L.L.C. instead of the

25  corporation?
```

1   A.   That was the place that I found in the UPRA that

2   I thought was reflecting the members and the -- the entity

3   name of the member.

4   Q.   And had any of the documents that you have just

5   testified to, specifically the UPRA and Plaintiff's Exhibit

6   5, had any of those been previously analyzed by you?

7   A.   As it pertained to creating a list of members, no.

8   I certainly looked at any number of those deal documents over

9   the years.

10  Q.   And did you feel like when you compiled your list based

11  on what you reviewed -- and by your list, I mean Plaintiff's

12  Exhibit 3 -- that it was accurate?

13          THE COURT:  If you do that one more time I'm going

14  to get a new lawyer to ask these questions.  He's on direct

15  examination.  Ask him questions to which he responds, not to

16  adopt what you want him to say.

17          MS. SHIRLEY:  Okay.

18          THE COURT:  And that's it.  That's your last chance

19  on that.

20          MS. SHIRLEY:  Okay.

21  BY MS. SHIRLEY:

22  Q.   Mr. Carrano, did you have any intent to mislead anyone

23  in this case, either the counsel involved in this case or the

24  Court, in preparing Plaintiff's Exhibit 3?

25  A.   No.  All the information reflected in that chart was

1    what I believed to be true and accurate at that time.

2          THE COURT:  True and accurate based upon what?

3    What were you told to do?

4          THE WITNESS:  Create a list of members and the

5    residence of them.

6          THE COURT:  And who told you to do that?

7          THE WITNESS:  There was an e-mail forwarded from

8    Joe, and there was no -- there was no further definition of

9    what any of that meant aside from what was forwarded in the

10   e-mail.

11         THE COURT:  So your lawyer sent you an e-mail

12   exchange that he had with opposing counsel and simply used

13   that as the instruction to you to prepare this list which is

14   Exhibit 3?

15         THE WITNESS:  Yes.

16         THE COURT:  He never gave you any further

17   guidance as to what federal jurisdiction requires and what

18   information he needed to make a representation to opposing

19   counsel with respect to jurisdiction and whether it existed

20   in this case?

21         THE WITNESS:  Not that I recall.

22         THE COURT:  Thank you.

23   BY MS. SHIRLEY:

24   Q.   Mr. Carrano, do you recall any -- did you have any

25   conversations, oral conversations with Mr. Letzer about the

1   e-mail forwarded from Mr. Kahnke?

2   A.   We had oral conversation about preparing the list, but

3   again I don't recall any specifics as to instruction or

4   clarification as to what that meant.  Just prepare a list of

5   members and the residence of them.

6           MS. SHIRLEY:  Your Honor, I apologize to revisit

7   that issue, but I just wanted the record to be clear --

8           THE COURT:  It's very clear.

9           MS. SHIRLEY:  -- that there was an e-mail and a

10  conversation.

11          THE COURT:  But he's testified as to what he was

12  told and what he was asked to prepare by the lawyer who had

13  the responsibility, you and your firm, and specifically

14  Ms. Fox who is not here, with respect to representations to

15  me about whether I had jurisdiction over this matter, and the

16  record is very clear that that was not done.

17          Continue.

18  BY MS. SHIRLEY:

19  Q.   Mr. Carrano, were there any other members of Purchasing

20  Power other than the ones on Plaintiff's Exhibit 3?

21  A.   I don't believe so.

22  Q.   And again, I know you testified to this, but what is the

23  only mistake that is in Plaintiff's Exhibit 3?

24  A.   The FSP III Kendrick Purchasing Power Holdings L.L.C. is

25  misidentified both in name and state of residence.

```
 1    Q.    Were you deposed in this case, Mr. Carrano?

 2    A.    I was.

 3    Q.    Were you deposed as the 30(b)(6) representative of

 4    Purchasing Power L.L.C.?

 5    A.    I was.

 6    Q.    Do you recall how many times?

 7    A.    Three times.

 8    Q.    Were you ever asked who were the members of Purchasing

 9    Power L.L.C. and their states of residency by counsel for

10    Bluestem?

11    A.    I was not.

12    Q.    Who is Keith Calhoun?

13    A.    Keith Calhoun is the former CEO of Purchasing Power

14    L.L.C., and he exited at the time of this transaction.

15    Q.    And was he deposed in this case?

16    A.    He was.

17    Q.    Did you attend his deposition?

18    A.    I did not, but I did review the transcript of it.

19    Q.    Do you recall whether Mr. Calhoun was ever asked by

20    counsel for Bluestem who are the members and citizenship of

21    Purchasing Power L.L.C.?

22    A.    I do not recall him ever being asked that question.

23    Q.    Who is Chad Delp?

24    A.    Chad Delp is the former CFO of Purchasing Power L.L.C.

25    Q.    And was --
```

1    A.    And, sorry, he continues to serve as a board member.

2    Q.    And does he have a relationship with Stephens, Inc.,

3    which is a third party?

4    A.    He had worked for them prior to joining Purchasing

5    Power, and he returned to work there after leaving Purchasing

6    Power.

7    Q.    And --

8    A.    Working for Stephens L.L.C. -- or Stephens Purchasing,

9    you know, not the -- the investment bank, Stephens, Inc.

10   Q.    And Stephens is the entity that was selling its

11   ownership percentage to Rockbridge pursuant to the UPRA; is

12   that right?

13   A.    Yes.

14   Q.    And did you attend Mr. Delp's deposition?

15   A.    I did not, but I did review the transcript of it.

16   Q.    Did counsel for Bluestem ever ask Mr. Delp, who was

17   working on behalf of the seller, who the members of

18   Purchasing Power L.L.C. were and their citizenship?

19   A.    I did not recall seeing that in the transcript.

20   Q.    Who is Elizabeth Halkos?

21   A.    Elizabeth Halkos is our chief revenue officer still

22   today and previously our chief marketing officer.

23   Q.    And was she deposed in this case?

24   A.    She was.

25   Q.    And did you attend her deposition?

1    A.   I did.

2    Q.   Was she asked by counsel for Bluestem who are the

3    members and citizenship of Purchasing Power L.L.C.?

4    A.   She was not.

5    Q.   And was the UPRA introduced during her deposition, do

6    you recall that?

7    A.   It was.

8    Q.   Who is Kevin Prokop?

9    A.   Kevin Prokop is a managing partner of Rockbridge Growth

10   Equity.  He continues to serve as a board member for

11   Purchasing Power L.L.C.  And he was really the lead of the

12   transaction from a Rockbridge standpoint.

13   Q.   Did you attend his deposition?

14   A.   I did not.

15   Q.   Did you review it?

16   A.   I did read the transcript.

17           MS. SHIRLEY:  I would like to mark as Plaintiff's

18   Exhibit 6 portions of the transcript of Mr. Prokop.

19           Your Honor, may I approach?

20           THE COURT:  You may.

21   BY MS. SHIRLEY:

22   Q.   Mr. Carrano, could you identify Plaintiff's Exhibit 6

23   for me?

24   A.   This appears to be an excerpt from the deposition of

25   Kevin Prokop.

```
1    Q.    Do you have pages 31 through 32 in front of you?

2    A.    I do.

3    Q.    Could you please read from 31 and 32?

4          THE COURT:  All right.  So you are showing him a

5    deposition that he did not attend, a transcript that he at

6    most read, that he can't identify, and then you are going to

7    have him read parts of that into the record?  And tell me why

8    you think that's proper?

9          MS. SHIRLEY:  Well, I would like for the Court to

10   be able to see Mr. Carrano reviewed the deposition testimony

11   that Mr. Prokop --

12         THE COURT:  So why didn't you bring Mr. Prokop if

13   you wanted him to testify about what happened in his

14   deposition?

15         MS. SHIRLEY:  Well, we are not offering the

16   testimony for the truth of it.  We are offering it to show

17   notice to all counsel that FSP III Kendrick Purchasing Power,

18   Inc. --

19         THE COURT:  Then if you want, you can bring the

20   original deposition transcript and introduce that, but we are

21   not going to do it this way.

22         MS. SHIRLEY:  The complete original?

23         THE COURT:  Yes.

24         MS. SHIRLEY:  I think I have that somewhere.

25         THE COURT:  You know, the problem in this case is
```

1    that lawyers are supposed to be able to rely upon

2    representations made to them by lawyers representing a

3    client.

4           What you are trying to do is to cover up the

5    representations that were made to opposing counsel and to me

6    by your firm upon which I relied in making the determination

7    that I could take jurisdiction of this case.

8           And the record is abundantly clear to me that this

9    person, who you are trying to put on the spot, got no

10   guidance as to the legal requirements of what needed to be

11   shown for there to be subject matter jurisdiction of this

12   case.

13          And the next person I want to hear from is your

14   partner.

15          MS. SHIRLEY:  Okay.

16          THE COURT:  So I know you are making this record,

17   trying to make it appear as if there is notice to the other

18   side.  But in my world and in this court, an officer of the

19   court who makes a representation to opposing counsel is

20   entitled to rely upon that.  And that's what happened in this

21   case.

22          MS. SHIRLEY:  And, Your Honor, what I'm trying to

23   show is that it was a good faith mistake.

24          We chose state court.  We didn't choose to be in

25   federal court.

```
1          THE COURT:  It doesn't -- you know, because federal

2    subject matter jurisdiction, although you don't like it,

3    allows somebody to remove, and when that happens it's the

4    responsibility of the parties and the lawyers representing a

5    party to let me know whether I do or do not have an issue of

6    jurisdiction.

7          And you and specifically Ms. Fox specifically

8    represented to me as officers of the court based upon now an

9    inadequate explanation to your client requesting information

10   to make representations that I had jurisdiction, and those

11   representations were wrong.

12         MS. SHIRLEY:  I would respond, Your Honor, that it

13   was a mistake between including an L.L.C. versus a

14   corporation.

15         THE COURT:  No, the mistake was --

16         MS. SHIRLEY:  It was an honest mistake.

17         THE COURT:  -- a lawyer did not properly develop

18   the information that is necessary for counsel and the Court

19   to determine if there is subject matter jurisdiction, and

20   then stiffed the opposing counsel for information, including

21   in a response to a discovery request saying we told you that

22   none of your -- that Bluestem, that there was no overlapping

23   jurisdiction or citizenship, and, therefore, we don't even

24   think we have to provide that information to you because

25   that's a settled matter.  And I think Ms. Fox signed that
```

 1   pleading too.

 2         MS. SHIRLEY:  Respectfully, Your Honor, that was a

 3   discovery dispute, and the documents at issue were thereafter

 4   produced.

 5         In fact, they were offered the UPRA.  It was

 6   produced before depositions even started.  So that was an

 7   initial discovery dispute, but we did produce the documents.

 8         THE COURT:  And did anybody on your side, who had

 9   made a representation not just to opposing counsel but to me,

10   say we made a mistake, we have now been producing information

11   and we know that it's not an L.L.C., it's a corporation, and,

12   in fact, there is no subject matter jurisdiction?

13         MS. SHIRLEY:  We only found that out recently, and

14   we did send a letter and we filed a document --

15         THE COURT:  Are you telling me that all of these

16   documents that you are saying put the other side on notice

17   didn't put you on notice?

18         MS. SHIRLEY:  I believe, Your Honor, that it put

19   all of the counsel on notice, but we were no longer focused

20   on jurisdictional issues.  We were focused on the substance

21   of the case and pursuing it.

22         THE COURT:  So when you produced -- when your firm

23   produced this document, which is now Exhibit No. 5, and saw

24   that a mistake had been made in a representation, including

25   to me, about subject matter jurisdiction, that it didn't

1    occur to you to say there is a problem in this case now, that

2    it's not an L.L.C. as we represented to you before, it's a

3    corporation, and we now know that that corporation, we've

4    never looked at the citizenship of it?

5              But you at the circuit and here have tried to lay

6    off on the other side the mistake that you and your firm

7    made.  And I have read your representations to the circuit,

8    and not once do you acknowledge that it was your

9    responsibility and your failure to meet that responsibility

10   that has caused this jurisdictional issue.

11             And, in fact, your entire submission to the

12   circuit was your explanation how it wasn't your fault at all,

13   that it was the other side's fault because they didn't allege

14   it specifically in the notice of removal, even though they

15   had relied upon what you told them in making that

16   representation.

17             And I have now learned a lesson, that I will never

18   trust lawyers again.  Because when I got the representation

19   twice from you, knowing that you had told them that there was

20   no jurisdictional problem and then made a representation to

21   me that there wasn't, that I am now going to forever not

22   trust lawyers' representations with respect to that, and

23   certainly not ones made by your firm.

24             MS. SHIRLEY:  Your Honor, I would like to respond

25   that the first time we became aware of the mistake was when

1    the Eleventh Circuit brought the issue to light.

2              THE COURT:  When was Exhibit No. 5 produced in this

3    case?  Was it produced in discovery?

4              MS. SHIRLEY:  It was produced by Stephens in

5    discovery.

6              THE COURT:  Were you aware that it had been

7    produced by Stephens?

8              MS. SHIRLEY:  Yes.

9              THE COURT:  And you were aware then that it was a

10   corporation and not an L.L.C., because you reviewed

11   everything that was produced; correct?

12             MS. SHIRLEY:  Yes.  But, Your Honor, if I may,

13   there are brackets in Plaintiff's Exhibit 5, and there are

14   probably twenty drafts of the same document going around.

15             THE COURT:  Isn't there a final document?

16             MS. SHIRLEY:  There may be, but there were even

17   mistakes within the final document, and I believe that

18   Mr. Carrano testified that there was a mistake in the

19   UPRA.  I mean, there were mistakes.

20             THE COURT:  Didn't you realize this at least, even

21   if incomplete, was a problem and might raise an issue that a

22   representation that you and your partner made to me was

23   wrong?

24             MS. SHIRLEY:  Your Honor, it did raise the spectre

25   of a problem, but we didn't -- neither --

```
 1              THE COURT:  But it never occurred -- raised a

 2     spectre of a problem, and it never even occurred to you to

 3     place a call to my chambers to say we need to stop until we

 4     get this ironed out?

 5              MS. SHIRLEY:  Your Honor, neither counsel for

 6     defendants nor counsel for plaintiffs were focused on

 7     jurisdictional issues during the heart of the discovery.  We

 8     did not look at this document and instantly see a red flag as

 9     to whether this Court had jurisdiction.

10              Certainly if we would have, we would have brought

11     it to the Court's attention so that we could seek remand

12     back to Georgia state court where we filed the case

13     originally.

14              THE COURT:  The problem with this case is not with

15     this witness.  It is with the lawyering by your firm.

16              MS. SHIRLEY:  Well --

17              THE COURT:  It is inconceivable that when you make

18     a representation to this Court with respect to jurisdiction

19     and the citizenship of parties, especially considering the

20     circuit authority that has been issued about L.L.C.s and the

21     requirement that their members be disclosed and their

22     citizenship of their members be disclosed, that a lawyer

23     would make a representation to opposing counsel knowing that

24     authority which is clear, that none of your members of the

25     L.L.C. were citizens of either Delaware or Minnesota, and
```

1   relying upon an e-mail that was sent to this poor fellow

2   without explaining to him the consequence of misidentifying

3   the information and whether or not you could stay in this

4   court.  Instead, you made the representation and then

5   affirmed it in a filing with me.

6        MS. SHIRLEY:  Respectfully, Your Honor, we did not

7   fail to identify the citizenship of the members, of the

8   L.L.C. members.  There was simply a mistake made in that an

9   L.L.C. member was listed as part of Purchasing Power L.L.C.

10  when, in fact, it was a corporation.

11       And the documentation in the UPRA, it's confusing

12  as to what is the entity.

13       THE COURT:  Look, I understand your desire to

14  deconstruct this to avoid the consequence of what you did as

15  lawyers, and the consequence of that was this.  This fellow

16  didn't know what needed to be shown with respect to the

17  removal of an action of this court.  Opposing counsel

18  requested you to provide that.

19       And then instead you relied upon this curt request,

20  and you and your partner knew that the request that was being

21  made by opposing counsel had to do with subject matter

22  jurisdiction.

23       And your lawyerly response to that was to forward

24  an e-mail to this poor witness, who is the CEO of the

25  company, who is not a lawyer, as you have abundantly pointed

1    out, and asked him then to provide information that was not

2    even accurate, rather than having a lawyer say let me tell

3    you the consequence and the importance of this and let me

4    tell you what citizenship means, and it's not just residence,

5    and let's make sure that we have this right.

6            And the reason why we are here is because the

7    lawyering was poor.  And instead you decided to beat each

8    other's brains out in this litigation.

9            Excuse me.

10           THE WITNESS:  Can you grab her?

11           THE COURT:  Can somebody catch her, please?  Would

12   you please be seated.

13           Let's take a recess.

14               (A recess is taken at 10:43 a.m.)

15                        --  --  --

16               (In open court at 11:02 a.m.:)

17           THE COURT:  Feeling better?  Are you feeling

18   better?

19           MS. SHIRLEY:  Your Honor, I sincerely apologize.

20           THE COURT:  No apology necessary.

21           MS. SHIRLEY:  I had bad food last night and was

22   ill, and I apologize.

23           Your Honor, I don't have any more questions of

24   Mr. Carrano, unless you do.

25           THE COURT:  I don't.

```
1              I did have a chance to read this deposition
2    transcript, and I would like for it to be part of the record,
3    if there is no objection to it.  That's the deposition of
4    Mr. Prokop.
5              MR. KAHNKE:  No objection, Your Honor.
6              THE COURT:  All right.  I am going to consider
7    that.
8              MS. SHIRLEY:  Would you like to hear from
9    Mr. Letzer?
10             THE COURT:  No, they have a chance to cross-examine
11   this witness first.
12             MS. SHIRLEY:  Okay.
13             MR. KAHNKE:  May it please the Court?
14                         --  --  --
15                    CROSS-EXAMINATION
16   BY MR. KAHNKE:
17   Q.   Mr. Carrano, you are the president and CEO of the
18   plaintiff in this action; is that correct?
19   A.   Yes.
20   Q.   And you are the person primarily responsible for
21   managing this litigation; is that correct, sir?
22   A.   Could you speak up, please?
23   Q.   Yes.  You are the person primarily responsible for
24   managing this litigation on behalf of the plaintiff; is that
25   correct?
```

1    A.    Managing, I'm not sure that I understand the context of

2    that as it pertains to what our in-house counsel or what our

3    external counsel would do.

4    Q.    Okay.  Within among the business people at the plaintiff

5    entity, Purchasing Power, are you the person who is primarily

6    responsible for making final decisions about what is done in

7    this litigation?

8    A.    Yes.

9    Q.    And you have spent hundreds and hundreds of hours

10   reviewing documents in connection with this case; correct?

11   A.    I have never quantified it, but a lot of hours, yes.

12   Q.    Okay.  And you are also represented as the corporate

13   representative in connection with this litigation; is that

14   correct?

15   A.    Yes.

16   Q.    And you were deposed over the course of a number of days

17   in connection with this action; correct?

18   A.    Yes.

19   Q.    And you spent hours and hours preparing for those

20   depositions; correct, sir?

21   A.    Again, I have never quantified that, but I did take time

22   to prepare for the depositions.

23   Q.    And you, in fact, reviewed the documents that were

24   filed with the Court in connection with this action; correct,

25   sir?

1    A.    Some of the documents, yes.  I don't know that I would

2    say all of the documents.

3    Q.    The verified complaint that your counsel showed you that

4    was originally filed in the state court, you reviewed that

5    before it was filed; correct, sir?

6    A.    Yes.

7    Q.    And you verified the accuracy of the statements in that

8    document; correct?

9    A.    Yes.

10   Q.    And in order to verify the accuracy of the statements

11   within that document, you took time to review that document

12   and to make sure that, to the best of your knowledge,

13   everything that was represented in that document was true and

14   correct.  Is that fair?

15   A.    Yes.

16   Q.    And, in fact, you took that same approach with respect

17   to the other documents that were filed with this Court that

18   you reviewed.  Is that accurate, sir?

19   A.    Again, if you can identify certain documents, I could

20   perhaps provide a more accurate answer.  But generally

21   speaking, probably, yes.

22   Q.    And you understand that -- let's go to last month, if we

23   can, when this jurisdictional issue was very much in focus in

24   this case after having been raised by the Eleventh Circuit

25   Court of Appeals, you were aware that there was

```
1   correspondence among counsel about the jurisdictional issue

2   at that time; is that correct?

3   A.   Yes.

4   Q.   And one of the things that was sent back and forth

5   between counsel was a letter from my colleague, Mr. Justman,

6   to your attorney, Ashby Kent, and that was on July 22nd.  Are

7   you aware of that?

8   A.   I cannot say that I am.

9   Q.   Okay.

10            MR. KAHNKE:  Your Honor, we do have such a

11  letter.  I would like to introduce it.

12            May I approach, Your Honor?

13            THE COURT:  You may.

14  BY MR. KAHNKE:

15  Q.   Mr. Carrano, I'm showing you what has been marked as

16  Defendant's Exhibit 1.  This is a July 22nd letter from

17  Jeff Justman to Ashby Kent.

18       Did you review this document?

19  A.   I'm sorry?

20  Q.   Did you review this document, sir, on or about July

21  22nd, 2014?

22  A.   No.

23  Q.   Have you ever seen this document before?

24  A.   Not that I recall.

25  Q.   Are you aware that in July of this year, counsel for
```

1    the defendant, Bluestem Brands, asked counsel for the

2    plaintiff to explain what the citizenship was of the

3    plaintiff entity?

4    A.   I understand that there was an issue about it.  I don't

5    know who asked who what or when that might have occurred.

6    Q.   And you are aware that the Eleventh Circuit Court of

7    Appeals had identified essentially the same issue?

8    A.   That information had been relayed to me by counsel,

9    yes.

10   Q.   Now, were you involved in developing the response that

11   your attorneys put together to that question?

12   A.   I was not.

13   Q.   You didn't have any role in it whatsoever?

14   A.   No.

15   Q.   Have you reviewed the response that your attorneys put

16   together to that letter or to that question?

17   A.   If you could produce it, I could let you know if I had

18   seen it or not.

19   Q.   Happily.

20              MR. KAHNKE:  Your Honor, we have a letter dated

21   August 19, 2014, yesterday, that we received electronically

22   yesterday afternoon that we would like to offer as

23   Exhibit 1-A.

24              THE COURT:  A letter from whom to whom?

25              MR. KAHNKE:  Thank you, it is a letter from

1    plaintiff's counsel to defendant's counsel.

2             If I may approach, Your Honor?

3             THE COURT:  You may.

4    BY MR. KAHNKE:

5    Q.   Mr. Carrano, have you seen Defendant's Exhibit 1-A

6    before?

7    A.   I don't believe so.

8    Q.   Have you seen any of the attachments to Defendant's

9    Exhibit 1-A before?

10   A.   I have.

11   Q.   Which exhibits have you seen?

12   A.   Well, they are unlabeled here.  The list of L.L.C.

13   members that I believe we have already presented.  I have

14   seen the Delaware certificate of incorporation, and then the

15   certificate of incorporation detail.

16   Q.   Have you seen -- have you seen the first document that's

17   attached, which would then be page three of Defendant's

18   Exhibit 1-A?

19   A.   I have seen it in preparing for this today, but I had

20   not seen it previously.

21   Q.   And when did you first see that document, sir?

22   A.   I'm sorry?

23   Q.   When did you first see that document, page three?

24   A.   Yesterday.

25   Q.   Okay.  When you first -- you have already testified

1    about Plaintiff's Exhibit -- what has been Plaintiff's

2    Exhibit 3, which is page four of Defendant's Exhibit

3    1-A.  When did you first see the Delaware state of

4    incorporation documentation for FSP III Kendrick Purchasing

5    Power Holdings, Inc.?

6    A.    Yesterday as well.

7    Q.    If you can go to the first page of the letter, please,

8    sir, in the second paragraph it says as follows:

9              When Randy Kahnke asked Joe Letzer on

10             January 18, 2012, whether PP LLC would, quote,

11             provide information about PP LLC's ownership

12             structure and the states of residence of its

13             members, closed quote, we were provided information

14             reflecting that there were three L.L.C. members

15             of PP LLC, including FSP III Kendrick Purchasing

16             Power Holdings L.L.C., and that none of those

17             L.L.C.s were resident citizens of Delaware or

18             Minnesota.

19        Do you see that, sir?

20   A.    I do.

21   Q.    Who were the three L.L.C. members of PP LLC in January

22   2012?

23   A.    The top three entries on the schedule on page four of

24   this document.

25   Q.    And those entities are listed as Purchasing Power

1   Investors L.L.C.; correct?

2   A.   Yes.

3   Q.   That's also known as Rockbridge; is that correct?

4   A.   Yes.

5   Q.   And the second is FSP III Kendrick Purchasing Power

6   Holdings L.L.C.; correct?

7   A.   Yes.

8   Q.   Also known as Falcon; correct?

9   A.   Yes.

10  Q.   And the final and third one is Stephens Capital Partners

11  L.L.C., also known as Stephens; is that correct?

12  A.   Yes.

13  Q.   In January of 2012, what did you do to identify the

14  members of Purchasing Power Investors L.L.C.?

15  A.   I did nothing to identify them.

16  Q.   In January of 2012, what did you do to identify the

17  members of Stephens Capital Partners L.L.C.?

18  A.   I did nothing to identify the individual members of

19  those L.L.C.s.

20  Q.   And what did your attorneys ask you to do by way of

21  identifying members of Stephens Capital Partners L.L.C. in or

22  about January 2012?

23         MS. SHIRLEY:   Objection, Your Honor.   I would

24  like to assert the attorney-client privilege.   And if --

25  I am fine with Mr. Carrano answering the question if the

1    Court would like to hear the answer, but I would simply like

2    to preserve the privilege and waive it as to this particular

3    question.

4              THE COURT:  You may answer the question.  The

5    privilege has been waived.

6              THE WITNESS:  Do you mind repeating?

7              MR. KAHNKE:  Certainly.

8    BY MR. KAHNKE:

9    Q.   What did your attorneys ask you to do by way of

10   identifying the members of Stephens Capital Partners L.L.C.

11   in or about January of 2012?

12   A.   I don't recall any specific instruction.

13   Q.   Did you have any communications with your counsel

14   whatsoever about that topic?

15   A.   Of identifying individual investors of the L.L.C.s,

16   I do not recall any.

17   Q.   And similarly what did your attorneys ask you to do by

18   way of identifying the members of Purchasing Power Investors

19   L.L.C. in or about January of 2012?

20   A.   Same response, I don't recall any specific instruction.

21   Q.   Okay.  And you are talking now about what you did and

22   communications you had with your counsel in January of 2012;

23   correct?

24   A.   Yes.

25   Q.   Okay.  And in January of 2012, did you have any

1    communications whatsoever with your counsel about what was to

2    be done by way of identifying the members of Purchasing Power

3    Investors L.L.C.?

4    A.    No.

5    Q.    As you sit here today, can you tell me who all of the

6    members are of the plaintiff that brought this action?

7    A.    The members of the plaintiff are listed here.

8    Q.    Can you as you sit here today identify for me who the

9    members are of these L.L.C.s?

10   A.    I cannot.

11   Q.    What have you done to determine that, sir?

12   A.    I have done nothing.

13   Q.    Has anyone asked you to determine that?

14   A.    They have not.

15   Q.    Has anyone instructed you that you are -- that you

16   should track down the citizenship of the members of each

17   of the L.L.C.s who are members of the plaintiff in this

18   action?

19              MS. SHIRLEY:  Your Honor, I am going to object as

20   to relevance.  The question here is not are the members of

21   the L.L.C. members of Purchasing Power L.L.C. diverse or

22   nondiverse.  The question here is there was a mistake in

23   identifying one of the members as an L.L.C. instead of an

24   Inc.

25              THE COURT:  Overruled.

1    MR. KAHNKE:  Do you recall the question, sir?

2    THE WITNESS:  I don't.

3    MR. KAHNKE:  Let me see if I can rephrase it.

4    BY MR. KAHNKE:

5    Q.   Has anyone, your attorneys or anyone else, at any time

6    ever asked you to identify the members of the members of the

7    plaintiff in this action?

8    A.   No.

9    Q.   Has anyone at any time ever asked you to identify the

10   citizenship of the members of the members of the plaintiff in

11   this action?

12   A.   No.

13   Q.   And just so we are clear, what can you tell me or what

14   do you know about the members of the members of the plaintiff

15   in this action as you sit here today?

16   A.   I can't tell you anything about them.

17   Q.   Well, sir, do you know or do you not know that certain

18   of those members, in addition to the Kendrick entity that's

19   been discussed here today, that your -- let me start over and

20   ask you a better question.

21        Sir, do you know that your attorneys have represented

22   that in addition to the Kendrick entity that's been

23   represented here today, there are yet other members that --

24   members of members of the plaintiff in this action that

25   destroy this Court's diversity of citizenship jurisdiction?

```
 1              MS. SHIRLEY:  Objection, Your Honor.  That assumes
 2     facts not in evidence.
 3              THE COURT:  Overruled.
 4     A.   I am unaware of that requirement.
 5     Q.   Let me put it to you another way.  As you sit here
 6     today, do you know if the members of the members of the
 7     plaintiff in this action, any of them, are citizens of
 8     Delaware or Minnesota other than Kendrick?
 9     A.   I do not know that.
10     Q.   If you can please go back to Defendant's Exhibit 1-A and
11     turn to page three, if you would, please?
12     A.   Okay.  And go to where, sorry?
13     Q.   Page three, please.
14     A.   Okay.
15     Q.   Now, this is a document that identifies FSP III Kendrick
16     Purchasing Power Holdings, Inc., as a member of Purchasing
17     Power Holdings L.L.C.  Is that your understanding of it?
18     A.   Yes.
19     Q.   What's the date of this document, sir?
20     A.   I don't know.  Is it dated somewhere on here?
21     Q.   Excuse me?
22     A.   Is it dated somewhere on here?  I don't see one.
23     Q.   Nor do I, sir.
24              Do you know if this is a final version of this
25     document?
```

1    A.   I don't know if it's a final version of this document.

2    Q.   And thus you don't know whether perhaps it's a draft.

3    Fair?

4    A.   Fair.

5    Q.   Okay.  Do you know if there are other drafts of this

6    document?

7    A.   I don't know.

8    Q.   Do you know if there were any changes made to this

9    document after the date of the closing of the transaction

10   that occurred relating to the plaintiff in this action in

11   October of 2011?

12   A.   I don't know when this was created or if it were changed

13   subsequent to that.

14   Q.   Can you turn the page, sir, to the next document that's

15   attached?

16        For the record, I would note that this appears to be the

17   same document that has been marked earlier in this hearing as

18   Plaintiff's Exhibit 3.

19        What is the date of this document, the date on which it

20   was created?

21   A.   There is no date identified.  However, I can recognize

22   it as one that I created on or about the date of the e-mail

23   exchange between you and Mr. Letzer January 20th of 2012.  So

24   it was sometime in that proximity.

25   Q.   Okay.  Was this document -- this document does not have

1    a Bates number on it, as you can see.  Was this document

2    produced in this litigation?

3    A.    I have no idea.

4    Q.    Were drafts of this document created?

5    A.    No.

6    Q.    Were changes made to this document after on or about

7    January 20th, 2012?

8    A.    Not that I made.

9    Q.    Was this -- do you know if anyone else made any changes

10   to this document?

11   A.    I don't know if anyone else made changes to it.

12   Q.    Were there any changes in the structure of the plaintiff

13   in this action that would have been required to be reflected

14   on this document after on or about January 20th, 2012, in

15   order to make this accurate?

16   A.    There are no changes that I would be aware of aside from

17   the misidentification of FSP III Kendrick Purchasing Power

18   Holdings L.L.C. and the residency there.

19   Q.    Did you send this document to any of your attorneys in

20   January of 2012?

21   A.    It was sent to Mr. Letzer.

22   Q.    On or about January 20th, 2012?

23   A.    Yes.

24   Q.    Now, what discussion did you have with Mr. Letzer about

25   this document when you sent it to him?

1      MS. SHIRLEY:  Objection.  I would assert the
2  attorney-client privilege, and allow for a limited waiver to
3  the extent the Court wants to hear the answer.
4      THE COURT:  I do.  So please answer it.
5  A.   I knew that there was a need to identify the members and
6  the state of residency as captured in the e-mail exchange
7  between you and Mr. Letzer.
8     The phone call that I had with Mr. Letzer was more
9  around timing and can you get the information to us, we need
10  to get this to opposing counsel.
11  Q.   Now, did Mr. Letzer ever explain to you what constitutes
12  residency for diversity of citizenship purposes?
13  A.   I do not recall us having that conversation.
14  Q.   Did Mr. Letzer ever explain to you what constitutes
15  citizenship for diversity of citizenship purposes?
16      MS. SHIRLEY:  Objection, Your Honor.  Again I would
17  object on the ground of relevance.  We are not talking about
18  inaccurate members of L.L.C.s or inaccurate citizenship.  We
19  are talking about a simple mistake in including an L.L.C. in
20  the chart as opposed to a corporation.
21      MR. KAHNKE:  If I might, Your Honor?
22      THE COURT:  Well, you can characterize it as a
23  simple mistake.  I don't so characterize it.  Nor do
24  I characterize the reliances of lawyers on that information
25  in making representations to counsel as an innocent

1    error.  So I'm going to overrule your objection.

2    BY MR. KAHNKE:

3    Q.   Do you recall the question, sir?

4    A.   If you could repeat, please?

5    Q.   Did Mr. Letzer ever explain to you what constitutes

6    citizenship for diversity of citizenship purposes regarding

7    federal jurisdiction?

8    A.   I do not recall us having that conversation.

9    Q.   Did Mr. Letzer or any of your other attorneys ever tell

10   you that for diversity of citizenship purposes, an entity may

11   be a resident or a citizen of more than one state?

12          MS. SHIRLEY:  I would object based on

13   attorney-client privilege.  Unless Your Honor wants to hear

14   it and overrule the objection, we would want it to be a

15   limited waiver.

16          THE COURT:  Well, I think the record for me is

17   clear because I have been listening to what you have to say.

18   All the lawyers want a different take on it, but with respect

19   to the preparation of this Exhibit 3, which is your list, you

20   had an e-mail, you were supposed to determine residence, and

21   you created this list without ever having a discussion with

22   Mr. Letzer or any other lawyer about what it is that they

23   specifically needed.  You just responded to the e-mail; is

24   that correct?

25          THE WITNESS:  Correct.  There was a conversation as

1   to the general intent of it, but the specificity around the

2   elements, you know, what residence, what citizenship mean,

3   I don't recall discussing that in detail.

4            THE COURT:  Thank you.

5   BY MR. KAHNKE:

6   Q.   And I turn your attention back to Plaintiff's Exhibit 2,

7   please.  The e-mail that appears on the first page of that

8   document is from Joe Letzer to Randall Kahnke dated January

9   20th, 2012.  Do you see that?

10  A.   Yes.

11  Q.   Now, you have seen this document before; correct?

12  A.   I have.

13  Q.   And the text of the document says:

14            Randy, we are informed by our client that none

15         of the members of the L.L.C. are resident citizens

16         of either the states of Minnesota or Delaware.  We

17         trust this gives you the essential information you

18         have requested to assess removability on diversity

19         grounds.

20       Do you see that?

21  A.   I do.

22  Q.   What was your understanding of what Mr. Letzer meant

23  when he said resident citizens?

24            MS. SHIRLEY:  Objection, Your Honor.  Calls for

25  speculation as to what Mr. Letzer meant in this e-mail to

1    Mr. Kahnke.

2           MR. KAHNKE:  Just seeking his understanding, sir.

3    He's reviewed the document.

4           THE COURT:  Well, he's not a lawyer.  He's already

5    said that he's never -- he didn't discuss the distinction

6    between resident or citizen with any lawyer.  He was asked to

7    make a list of residents and he did that.

8           MR. KAHNKE:  Fair.

9    BY MR. KAHNKE:

10   Q.   Let me turn your attention, sir, if I could, to

11   Plaintiff's Exhibit 4, which is the unit purchase and

12   recapitalization agreement.

13        Did you send that document to Mr. Letzer in connection

14   with your analysis of the L.L.C. members of the plaintiff in

15   this case?

16   A.   I believe Mr. Letzer had a copy.  I did not send it to

17   him in connection with this topic.

18   Q.   And did you tell him that that was your source document

19   for creation of your list?

20   A.   I did not.

21   Q.   Did he ask you?

22   A.   He did not, that I recall.

23   Q.   Can you please turn to Plaintiff's Exhibit 5.

24        Now, I think we already have this, Your Honor.  I don't

25   want to replow old ground.

1       Is it correct, sir, that you do not know whether this

2   is, in fact, a final document or a draft?

3   A.   I don't know.

4   Q.   And you don't know if there are other drafts of this

5   document that exist; is that correct?

6   A.   I believe there are countless drafts of this document.

7   Q.   Do you know the date that this document was created,

8   sir?

9   A.   I don't know the specific date, but it was likely

10  created September of 2011.

11  Q.   In connection with the transaction that closed in

12  October of 2011?

13  A.   Correct.

14  Q.   Do you know if this document was changed after October

15  of 2011, the closing date?

16  A.   I don't think I have ever seen a version after October

17  14, 2011.

18  Q.   Well, we know that this is not the final one and it's

19  not complete.  Fair?

20  A.   We do.

21  Q.   Now, sir, after this case was removed to this court,

22  Purchasing Power L.L.C. filed an amended verified complaint

23  for injunctive relief and damages with this federal court;

24  correct?

25  A.   Yes.

```
 1   Q.    And you reviewed and verified that complaint; correct?

 2   A.    Yes.

 3             MR. KAHNKE:  It is -- this document that I am

 4   referencing, Your Honor, is part of the court record, but for

 5   reference may I hand -- I would like to mark it.

 6             THE COURT:  Mark it and give it to him.  Let's move

 7   this along.

 8             MR. KAHNKE:  Very good.

 9             Would you like a copy, Your Honor?

10             THE COURT:  I have reviewed it.

11   BY MR. KAHNKE:

12   Q.    We have marked this as Defendant's Exhibit 2 for the

13   record.

14        On the first page it says parties, jurisdiction and

15   venue.  Do you see that, sir?

16   A.    Yes.

17   Q.    On page two, the last sentence says, This Court has

18   subject matter jurisdiction over the claims at issue in this

19   action.  Is that correct?

20   A.    I'm sorry, which paragraph number?

21   Q.    It's the last sentence on the bottom of page two.

22             THE COURT:  Paragraph 3.

23   BY MR. KAHNKE:

24   Q.    Paragraph 3.

25   A.    I see it.
```

1    Q.    And I read that accurately; correct, sir?

2    A.    Yes.

3    Q.    If you can go to the last page of this document, do you

4    see that that is titled verification?  Is that correct?

5    A.    Yes.

6    Q.    And it says, Personally appeared before the undersigned

7    officer duly authorized by law to administer oaths, Richard

8    Carrano -- and that's you; correct, sir?

9    A.    Yes.

10   Q.    It says, President and Chief Executive Officer of

11   Purchasing Power L.L.C., who after being duly sworn

12   deposes and states that the matters contained in the

13   foregoing amended verified complaint for injunctive relief

14   and damages are true and correct to the best of my current

15   knowledge.

16         And then it's your signature; correct?

17   A.    It is.

18   Q.    And it says, Sworn to and subscribed before me this 15th

19   day of August 2012 by the notary public; correct?

20   A.    It does.

21   Q.    And what did you do to verify the accuracy of the

22   representations that you made to the Court in this document,

23   sir?

24   A.    I reviewed the elements that I think were probably

25   germane to the facts that I was aware of, which I would say

1    jurisdiction was not one of those.

2    Q.   Okay.  I will also reference -- I'm happy to handle this

3    however you would like to for record purposes, Your Honor,

4    but I would also like to reference plaintiff's motion for

5    leave to file second amended complaint and memorandum in

6    support thereof.

7            THE COURT:  Before you get to that, let me -- this

8    complaint that you have before you, which I think is

9    Exhibit -- is it 3?

10           MR. KAHNKE:  We have it as Defendant's Exhibit 2,

11   Your Honor.

12           THE COURT:  Who did you communicate with at the

13   Burr Forman firm about filing the amended complaint and who

14   asked you to verify it?  Is there a lawyer that you were

15   dealing with?

16           THE WITNESS:  It was a team of lawyers.  I can't

17   say that there was one specific individual.

18           THE COURT:  And who were the lawyers that you

19   dealt with in connection with being asked to verify this

20   complaint and authorizing it to be filed?

21           THE WITNESS:  It would be Ashby Kent or

22   Joe Letzer.

23           THE COURT:  Do you remember specifically who

24   sent it to you for ultimate verification and signature

25   before a notary?

```
 1              THE WITNESS:  I don't know specifically.  Likely
 2    Ashby.
 3              THE COURT:  Okay, thank you.
 4    BY MR. KAHNKE:
 5    Q.    Do you have documents -- let me -- just following
 6    on that, how did you typically communicate with your
 7    counsel around documents such as this amended verified
 8    complaint?
 9    A.    Prior to hiring in-house counsel, which was March of
10    2013, I would communicate directly with them generally via
11    e-mail.
12    Q.    Okay.  And have you kept those e-mails in your e-mail
13    account?
14    A.    There is an archiving time stamp for that kind of
15    stuff.  I can't tell you if it -- what the retention period
16    is or not.  It may or may not be retained.
17    Q.    Do you have any either hard copy or electronic folder
18    that you kept of your communications with counsel regarding
19    this litigation?
20    A.    For some items, yes.  Certainly not for all items.
21    Q.    Okay.
22              MR. KAHNKE:  Your Honor, we have marked for record
23    purposes again another document that is in the Court's
24    docket.  This is plaintiff's motion for leave to file second
25    amended complaint and memorandum in support thereof that was
```

1    filed with the Court on October 5, 2012.  I would like to

2    show it to the witness for his reference.

3            THE COURT:  Please mark it and give it to

4    him.  Let's move this along.

5            MR. KAHNKE:  Okay.

6            THE COURT:  What's the exhibit number?

7            MR. KAHNKE:  This is Exhibit No. 3, Your Honor.

8            THE COURT:  And tell him what you want him to look

9    at.

10           MR. KAHNKE:  I'm sorry?

11           THE COURT:  Tell him what you want him to look at

12   on this.

13           MR. KAHNKE:  Yes.

14   BY MR. KAHNKE:

15   Q.   Sir, if you could please go -- you will need to go into

16   the document.  The first document is the memorandum.  The

17   second document is the second amended verified complaint for

18   injunctive relief and damages.  It' attached --

19           THE COURT:  It's attached to the memorandum.  It's

20   going to look a lot like what you just looked at.  It's

21   another amended complaint but it's now a second one.

22           THE WITNESS:  Is there a page number?

23   BY MR. KAHNKE:

24   Q.   It's going to be at about page fourteen or fifteen, I

25   believe.

1    A.   I'm not sure I'm following what I'm --

2              MR. KAHNKE:  May I approach to show him,

3    Your Honor?

4              THE COURT:  You may.  Let's -- come on, let's get

5    this done.

6              MR. KAHNKE:  Okay.

7              THE COURT:  Because I have got some questions for

8    him.

9              MR. KAHNKE:  Go to page -- yeah, just keep going.

10             THE WITNESS:  Okay.

11   BY MR. KAHNKE:

12   Q.   So I'm showing you what at the top is marked as page

13   3 of 117, at the bottom it's marked as page two of the second

14   amended verified complaint.  Do you see that?

15   A.   I do.

16   Q.   And Paragraph 4 says, This Court has original subject

17   matter jurisdiction over the claims in this action pursuant

18   to 28 U.S.C. Section 1332 because there is complete diversity

19   of citizenship between the parties.  Do you see that?

20   A.   I do.

21   Q.   Did you review this document before it was filed with

22   the Court?

23   A.   I believe so.

24   Q.   And who -- and did you have any communications with your

25   counsel about this document before it was filed with the

1    Court?

2    A.   Yes.

3    Q.   Who did you have communications with?

4    A.   Again, specifically for this document I'm not sure, but

5    either Ashby Kent or Joe Letzer.  Most likely Ashby.

6    Q.   And what did you discuss with them regarding the

7    accuracy of these statements contained in this document?

8    A.   I can't say that I recall anything.

9    Q.   Okay.

10             MR. KAHNKE:  Your Honor, for the record and in the

11   interest of brevity, we also have plaintiff's motion for

12   leave to file a revised second amended complaint and

13   memorandum in support thereof.

14             It's in the record.  I'm happy to go over it with

15   this witness or I'm happy to just move forward if the Court

16   would prefer?

17             THE COURT:  I think the lawyers are going to

18   recognize that he didn't -- that they drafted those

19   statements about jurisdiction, that they did submit it to him

20   for verification, that either Mr. Letzer or Ms. Fox submitted

21   it to him, and he signed it.

22             Will counsel agree to that?

23             MS. SHIRLEY:  Yes, Your Honor.

24             THE COURT:  All right.

25             MR. KAHNKE:  Thank you, Your Honor.  We will move

1    forward then.

2         Your Honor, just to signal where I intend to go

3    next, I think we can do it quickly.

4         Just to make sure the record is complete --

5    we are happy to proceed however you like -- we do have a

6    series of communications among counsel that I believe this

7    witness is familiar with that relate to the written

8    discovery that was served in this case and the responses

9    that came back.

10        THE COURT:  This is all on the issue of what the

11   lawyers were representing to you with respect to the

12   citizenship or the refusal to provide specific information

13   about the citizenship of the members.  It doesn't relate to

14   whether or not any of the members of the L.L.C. of the

15   plaintiff were or were not diverse; is that correct?

16        MR. KAHNKE:  I think that's fair, Your Honor.

17        THE COURT:  All right.  Well, what I'm thinking

18   about doing, everything I have heard this morning makes me

19   more troubled about what I'm going to do ultimately in this,

20   but what I have to get to the circuit is whether or not -- is

21   a factual finding as to whether or not any of the L.L.C.

22   members were citizens of Delaware or Minnesota.

23        And I don't think you are contesting that based

24   upon this testimony; is that right?

25        MR. KAHNKE:  That is correct, Your Honor.

```
1          THE COURT:  So my thinking is once it's remanded
2    back here, that I will then have jurisdiction again, and then
3    I will decide what further I need to do.
4          MR. KAHNKE:  Okay.  Fair.  In light -- and that's
5    helpful.  I appreciate that guidance.
6          In light of that, let me -- may I consult with my
7    partner for just a moment?
8          THE COURT:  You may.
9          MR. KAHNKE:  I will stop there in light of the
10   Court's guidance, Your Honor, and reserve further questions
11   for a later day.
12         THE COURT:  Mr. Carrano, since you are here,
13   I still just want to figure something out so that we don't
14   have to bring you back.
15         This unit purchase and recapitalization agreement,
16   which was Exhibit 99 to some deposition, I guess -- what's
17   the exhibit number that we have given it for this hearing?
18         MS. SHIRLEY:  It's Plaintiff's Exhibit 4,
19   Your Honor.
20         THE COURT:  Of course, it's the first time
21   I have seen this, but I think this is an important document
22   to the corporate organization and ownership of the plaintiff
23   in this case.  Is that a fair characterization of the
24   document?
25         THE WITNESS:  Yes, Your Honor.
```

```
 1            THE COURT:  And I think what I heard you say was
 2    that a copy of the unit purchase and recapitalization
 3    agreement, which is Exhibit 4, at some point before the
 4    case was even filed had been given to your lawyers at
 5    Burr Forman?
 6            THE WITNESS:  I can't be accurate if that had
 7    happened or not.  Again, I'm not sure exactly the timeline of
 8    discovery.  It's possible that it only got to them after
 9    discovery had commenced.
10            THE COURT:  Do you believe it was in their
11    possession -- I'm sorry, is there any reason why everybody is
12    standing here?
13            MR. KAHNKE:  No, Your Honor, just waiting for
14    you.  I didn't want to be shuffling papers while you were
15    speaking.
16            THE COURT:  No, you can do that.  You can listen
17    while you are shuffling around.
18            MR. KAHNKE:  Okay.
19            THE COURT:  Of course, before a complaint was
20    filed, my thinking, just the way I used to practice law, is
21    that something like this I would have made known to my
22    lawyers so that they knew who it was that they were
23    representing and what action they were going to file.
24            So do you think you did that before the case was
25    filed?
```

1                THE WITNESS:  You know, I cannot testify

2      accurately as to when that would have been produced.

3      Obviously we had much discussion leading into the filing

4      of the claims.  I'm not sure if it was produced during

5      discovery or beforehand.

6                THE COURT:  Do you think it was -- do you think

7      they had it before this question about the citizenship that,

8      from what you understood, the residence of the parties came

9      up?

10               THE WITNESS:  I would say likely not.

11               THE COURT:  So did they know that it existed?  Did

12     they know that there was a document that described who the

13     buyers and sellers were?

14               THE WITNESS:  They knew that there was a

15     transaction.  I would assume they would recognize that there

16     would be deal documents related to it, whether in this form

17     or something else.  I would assume that they would know there

18     was a transaction.

19               THE COURT:  And based upon your communication with

20     them, they would have known that there was a major

21     transaction that occurred before the complaint was filed?

22               THE WITNESS:  Yes.

23               THE COURT:  Right.  And as lawyers, you would

24     expect them to know that major transactions do have detailed

25     transaction documents describing what the transaction was and

1    what the obligations and responsibilities were to the

2    parties.  Is that fair to say?

3              THE WITNESS:  Yes.

4              THE COURT:  All right.  So I think you said that

5    in answering this question that was -- you interpreted from

6    this e-mail that you got that's been introduced in evidence,

7    which I guess is Exhibit 2, that you went to this document to

8    answer the question about residence; correct?

9              THE WITNESS:  Yes.

10             THE COURT:  And tell me again what page you went

11   to?

12             THE WITNESS:  Page 56, which is the -- I guess the

13   notices section.

14             THE COURT:  Under Article IX, Miscellaneous,

15   where if somebody had to give notice, this is where you sent

16   them?

17             THE WITNESS:  Yeah, exactly.

18             THE COURT:  Now, in just leafing through this, your

19   name appears in this document a lot because you were the CEO

20   and President of the --

21             THE WITNESS:  Of the new co.

22             THE COURT:  The holding company; right?

23             THE WITNESS:  Of Purchasing Power L.L.C. after the

24   change in ownership.

25             THE COURT:  All right, good.  Now, I know you are

1   not a lawyer, but you have done deal documents in the past,

2   haven't you?

3            THE WITNESS:  Yes.

4            THE COURT:  All right.  And don't all deal

5   documents begin with a representation as to who is involved

6   in the deal, who is the buyer and who is the seller?

7            THE WITNESS:  Yes.

8            THE COURT:  And that's really -- that's the

9   definition of who is buying and who is selling and what

10  specific entities were involved; correct?

11           THE WITNESS:  Yes.

12           THE COURT:  So I just happened to glance at the

13  first page of the unit purchase that has the buyers and the

14  sellers and defines what their citizenship is.  Did you look

15  at that?

16           THE WITNESS:  So if you review the e-mail that --

17           THE COURT:  Did you look at that?

18           THE WITNESS:  For this response, I did not.

19           THE COURT:  Would you look at it now, please?

20           THE WITNESS:  Yes, certainly.

21           THE COURT:  If you are looking at -- do you have

22  it?  It's entitled unit purchase and recapitalization

23  agreement.  It comes after the table of contents.  Do you see

24  that?

25           THE WITNESS:  Yes.

1          THE COURT:  So these are the parties who, in fact,

2    ended up -- there is listed here the parties who ended up

3    being members of the L.L.C. that's filed suit; correct?

4          THE WITNESS:  Two of them.

5          THE COURT:  One was Purchasing Power Investors

6    L.L.C.?

7          THE WITNESS:  Yes.

8          THE COURT:  And what does it say it is?  What kind

9    of company, what state?

10          THE WITNESS:  Delaware limited liability company.

11          THE COURT:  So this transaction, which you were

12    intimately involved, in the very first description of who was

13    involved in it, who ended up being a limited liability

14    company, shows you that the state that it was incorporated

15    was Delaware; correct?

16          THE WITNESS:  That is if you have an understanding

17    of what citizenship means --

18          THE COURT:  I understand that.

19          THE WITNESS:  -- for which --

20          THE COURT:  But Delaware is the state that's

21    associated -- and the only state associated --

22          THE WITNESS:  Yes.

23          THE COURT:  -- with Purchasing Power Investors;

24    right?

25          THE WITNESS:  Correct.

```
1          THE COURT:  Now, the next other party to this

2   transaction that ultimately ended up being a member filing

3   this suit is FSP III Kendrick Purchasing Power Holdings,

4   Inc.; correct?

5          THE WITNESS:  Yes.

6          THE COURT:  What's the one state associated with

7   that?

8          THE WITNESS:  A Delaware corp.

9          THE COURT:  Yeah, not an L.L.C.  It's a Delaware

10  corp. that you knew when you entered into this transaction

11  that those were two of the important parties and the state

12  that was associated with them; correct?  Right?

13         THE WITNESS:  As part of the deal I only recognized

14  Rockbridge and Falcon.  The actual underlying investor

15  entities was not something that was germane to my

16  understanding of the transaction.

17         THE COURT:  Well, you signed these documents,

18  didn't you?  Well, you know who the purchaser --

19         THE WITNESS:  Yes, I assume I did.

20         THE COURT:  Well, shall we go and find your

21  signatures now?

22         THE WITNESS:  No.  I'm assuming my name is in

23  there.

24         THE COURT:  Yeah.  And you knew that this was a

25  transaction where there were sellers and buyers; correct?
```

```
 1              THE WITNESS:  Certainly, yes.
 2              THE COURT:  And you knew that some of these parties
 3    were going to end up as members of the L.L.C., whose suit you
 4    authorized; correct?
 5              THE WITNESS:  Yes.
 6              THE COURT:  And the state for two of those members
 7    was not the state that was listed in your list.  It was the
 8    state of Delaware; correct?
 9              THE WITNESS:  I'm sorry?
10              THE COURT:  You never listed the state of Delaware
11    with respect to either of those members, did you?
12              THE WITNESS:  I didn't.  Again, I was answering
13    residence, which in my interpretation is where is their
14    office.
15              THE COURT:  I understand that, because nobody ever
16    told you that there was a difference; is that correct?
17              THE WITNESS:  Correct.
18              THE COURT:  All right.  But at some point in time,
19    this document, which I think Ms. Shirley was very careful to
20    point out was long, was provided to the lawyers; right?
21              THE WITNESS:  Yes, both sides.
22              THE COURT:  And they certainly would have had a
23    chance to read this and seen these two members were Delaware
24    corporations; correct?
25              THE WITNESS:  Yes.
```

1          THE COURT:  I mean, it didn't take me very long,

2     being distracted by the testimony, to make -- to find out who

3     the parties were, to simply look at the first paragraph?

4          THE WITNESS:  It was standing in plain sight.

5          THE COURT:  That it was indeed.

6          And although in plain sight, repeated

7     representations were made, including in filings with this

8     Court, that diversity of citizenship existed, even though in

9     plain sight it did not.  Would you agree with that?

10          THE WITNESS:  I would.

11          THE COURT:  Anything else?

12          MS. SHIRLEY:  Your Honor, I have a couple of

13     questions.

14          May I approach?

15          THE COURT:  You may, go ahead.

16          The only reason why I asked those questions is

17     because there is going to be further consideration of the

18     issue of the investment of judicial and other resources

19     with respect to the representations that were made to the

20     Court.

21          But right now I need to get to the circuit an

22     answer to the question that they have asked based upon what

23     we now know is the plain sight document that would have

24     disclosed it earlier to the lawyers.  But I will deal with

25     that later.

```
 1              And if you want, you can bring him back.
 2              I'm trying to avoid you having to come back.  But
 3    that doesn't mean you are not going to come back for any
 4    follow-up hearings that we might have.
 5              MS. SHIRLEY:  May it please the Court?
 6              THE COURT:  Go ahead.
 7                           -- -- --
 8                      REDIRECT EXAMINATION
 9    BY MS. SHIRLEY:
10    Q.   Mr. Carrano, the Court just pointed out in the unit
11    purchase and recapitalization agreement, Plaintiff's Exhibit
12    4, that Purchasing Power Investors L.L.C. is listed as a
13    Delaware limited liability company.  Are you familiar with
14    that?
15    A.   Yes.
16    Q.   Okay.  But if you go to your chart, Plaintiff's Exhibit
17    3, it lists Purchasing Power Investors as being what state of
18    residence?
19    A.   Michigan.
20    Q.   Is it your understanding that all of the members of
21    Purchasing Power Investors L.L.C. are residents of the state
22    of Michigan?
23    A.   I don't know where the members of Purchasing Power
24    L.L.C. -- or who they are or where they are resident.
25    Q.   Where did Michigan come from then and not Delaware as
```

1  represented in the UPRA?

2  A.    Same concept, page 56.  I think if you look at the

3  notices of where you would reach out to that entity, a

4  Michigan address is identified.  Detroit, Michigan.

5  Q.    So that's where that came from in your chart?

6  A.    Yes.

7  Q.    Do you recall that the Plaintiff's Exhibit 4, the UPRA,

8  was not provided to plaintiff's counsel until January of

9  2013?

10  A.    I don't recall when it was, but that would sound logical

11  given the timeline for discovery.

12  Q.    And there was some discussion about -- or there has been

13  a lot of discussion about your interactions with Mr. Letzer

14  regarding preparing Plaintiff's Exhibit 3, and I would like

15  to make sure that the record is clear.

16       You received the e-mail from Mr. Kahnke; is that right?

17  A.    Yes.

18  Q.    Okay.  And then there has been a discussion that

19  there --

20            THE COURT:  We have taken testimony with him on

21  that.  I am not going to let you do this, to cast this in the

22  way that you want him to answer.

23            I know he's been prepared for this.  He's on direct

24  examination.  You are now on redirect.  You may ask redirect

25  questions.

```
 1              MS. SHIRLEY:  And I apologize.  I was trying to
 2   speed things up.  I do not mean to be inserting my questions
 3   as testimony.
 4              THE COURT:  Just ask him what he knows, if you
 5   think that we need to hear it again.
 6   BY MS. SHIRLEY:
 7   Q.   Do you recall the specifics of the conversation you had
 8   with Mr. Letzer regarding citizenship of the members of
 9   Purchasing Power L.L.C. in January of 2012?
10   A.   I don't recall what specifically was discussed.
11   Q.   With respect to Defendant's Exhibit 2, I believe, if you
12   could get that back in front of you?  It's the verified
13   complaint.
14   A.   Defendant's, sorry?
15   Q.   Yes.  I believe you were pointed to page two which
16   represents that there was subject matter jurisdiction with
17   this Court.
18   A.   Yes.
19   Q.   And then the very last page is your verification?
20   A.   Yes.
21   Q.   And could you read the verification for me on the very
22   last page?
23              THE COURT:  He's not verifying legal
24   representations.  I know that.
25              MS. SHIRLEY:  Okay.
```

```
 1              THE COURT:  That was what you were supposed to do
 2    was to make sure that when you made a representation in a
 3    pleading, that there was indeed subject matter
 4    jurisdiction.
 5              So I don't hold him responsible --
 6              MS. SHIRLEY:  Okay.  That was my question.
 7              THE COURT:  -- for representations that you made to
 8    me.
 9              MS. SHIRLEY:  That was my only point, that it was
10    based upon his information and belief.
11              I have nothing further.
12              THE COURT:  Thank you for being with us.
13              MR. KAHNKE:  Your Honor, may I ask one more
14    question?
15              THE COURT:  Does it have to do with ownership?
16              MR. KAHNKE:  It does, Your Honor.  It actually
17    follows on some of the questions you were putting to the
18    witness.
19              THE COURT:  All right.
20                            --  --  --
21                     RECROSS-EXAMINATION
22    BY MR. KAHNKE:
23    Q.   It relates to Plaintiff's Exhibit 4, the unit purchase
24    and recapitalization agreement.
25    A.   Okay.
```

1    Q.    Page one of that document that references FSP III

2    Kendrick Purchasing Power Holdings, Inc., a Delaware

3    corporation.  Do you see that?

4    A.    I'm sorry, which part again?

5    Q.    The first paragraph starting at the end of the third

6    line, it references FSP III Kendrick Purchasing Power

7    Holdings, Inc., a Delaware corporation.

8    A.    Yes, I see that.

9    Q.    Does this document state that this Delaware corporation

10   is a member of the entity that is the plaintiff in this

11   case?

12   A.    I'm not sure that I understand.  I think it would

13   identify them as a member.

14   Q.    Does it state that they are -- does it state here -- and

15   I understand it's a long document, sir.  But the question

16   before the Court here, very central to that is who are the

17   members of the plaintiff entity in this case, Purchasing

18   Power L.L.C.

19        Does this document state that this Kendrick entity,

20   the Delaware corporation, is a member of Purchasing Power

21   L.L.C.?

22   A.    I would assume that it does.  They are identified as

23   a buyer.  I would assume the buyers are identified as

24   members.

25   Q.    That would be your assumption?

1    A.    It is.

2    Q.    But then, of course, there would be no need for you to

3    go through all the other documents relating to ownership

4    interest and structure that were drafted and changed over

5    time; fair?

6    A.    Probably not fair.

7    Q.    Probably not fair?  You would need to have accessed

8    those as well in order to determine who the members were?

9    A.    It depends again on what type of membership information

10   you are trying to gather.

11        If you are looking for the name of the entity, yes.  If

12   you are trying to find ownership percentages, contributed

13   capital, any other elements of the deal, you likely would

14   have to piece together a number of items.

15   Q.    Okay.

16            MR. KAHNKE:  Your Honor, in the interest of time

17   I want to stop there, but note for the Court that I think if

18   we go through this document, we will not find that this

19   Delaware corporation is identified as a member.

20            And I don't want to go through this exercise of

21   having him page through and page through and look for

22   it.  I would just represent that to the Court, and we are

23   happy to take that up at an appropriate time with Your Honor,

24   or now.

25            THE COURT:  So now you are contesting that they

 1    were a member, and that if they are not a member, then there

 2    is no problem with diversity?

 3            MR. KAHNKE:  My only point is that on the face of

 4    this document, you cannot tell that that entity, that

 5    Delaware corporation, is a member of the plaintiff in this

 6    action.  That's the only point.

 7            THE COURT:  Well, so I'm not sure I have now

 8    enough information, even though it was your responsibility

 9    to provide it, Ms. Shirley, as to -- other than what this

10    witness has said, and now this witness is sort of equivocal

11    on whether or not he knows who the members are.

12            So doesn't somebody -- isn't there a document when

13    you become an L.L.C. that you have to tell the government

14    authorities who the members of the L.L.C. are, and do you

15    have that?

16            MS. SHIRLEY:  May I approach?

17            THE COURT:  Do you have that?

18            MS. SHIRLEY:  We have a capitalization table.

19            THE COURT:  No, isn't it -- in order to be a legal

20    entity, don't you have to register with the Secretary of

21    State?

22            MS. SHIRLEY:  There is a registration, but it does

23    not reflect the members or their citizenship.

24            In fact, the members of two of the L.L.C. -- well,

25    the members of the L.L.C.s that are on Mr. Carrano's list, it

1    is confidential information that we don't even have access

2    to.

3              We requested it via e-mail in January of 2012, and

4    we were denied the request.

5              THE COURT:  Denied by whom?

6              MS. SHIRLEY:  We asked Rockbridge.

7              I didn't intend to present this into evidence

8    because it was work product.  It was pursuant to our request,

9    but I have an e-mail where we asked Chad Delp with Purchasing

10   Power who was also with Stephens to find -- it says, We need

11   a list of the members of Purchasing Power's L.L.C. and FSP

12   Kendrick Purchasing Power Holdings and Stephens Purchasing

13   Power L.L.C.  Those are the three entities on Mr. Carrano's

14   chart.

15             There is a response that says, quote -- this is

16   to Ernst & Young, who was involved in the corporations --

17   It would be very atypical for us to provide the members of

18   our investment entity.

19             Because they are not Purchasing Power entities,

20   they are third parties over whom we don't have control.

21   Rockbridge is an investment banker.

22             THE COURT:  Well, you have got plenty of control

23   over the course of litigation.  You have subpoenas that can

24   be served and --

25             MS. SHIRLEY:  Right.  But this was originally when

```
1   we were trying to answer Mr. Kahnke's questions, and we were
2   not -- I mean, we weren't subpoenaing people for information
3   about our citizenship.
4        He could have subpoenaed them for information about
5   their citizenship.
6        THE COURT:  Well, I know, but you took it upon
7   yourself to answer the question knowing what he wanted.
8        MS. SHIRLEY:  Correct, and we asked.  And there is
9   an e-mail chain here.  And if Your Honor would like to see
10  it, we will happily --
11       THE COURT:  Here is what I want.  I don't think I
12  am satisfied now that I know who the members of Purchasing
13  Power L.L.C. are, even though I put aside this time and we
14  have taken two and a half hours to get that.
15       First, do you have the -- whatever was filed with
16  the Secretary of State by which Purchasing Power L.L.C. was
17  created and registered?
18       MS. SHIRLEY:  We --
19       THE COURT:  Do you have that with you?
20       MS. SHIRLEY:  I can look through my documents.  I
21  have seen it.
22       I can assure you it does not list the members or
23  their citizenship.  We asked these very same questions
24  because we wanted to know.  The operating agreement does not
25  list them.
```

```
 1              THE COURT:  It's an easy question.  Do you have
 2   it?
 3              MS. SHIRLEY:  Pardon me?
 4              THE COURT:  Do you have it?
 5              MS. SHIRLEY:  I can look for it.
 6              THE COURT:  And then, second, who could I call in
 7   here and put under oath to tell me who it is that are the
 8   Purchasing Power L.L.C. members and what their citizenship
 9   is?
10              MR. BIRGE:  May it please the Court, my name is
11   Greg Birge.  I am the current general counsel and current
12   corporate secretary of Purchasing Power.  I was hired a
13   little over a year ago, and I am probably the only corporate
14   lawyer in this whole courtroom.
15              I'm sure you have lots of corporate experience,
16   Your Honor, but the L.L.C. document that you are seeking
17   typically doesn't declare who the members are.
18              THE COURT:  I know that, but I want to at least be
19   able to say that I know that it's been incorporated.
20              MR. BIRGE:  I understand.
21              THE COURT:  And then I need somebody to testify
22   under oath who they are.
23              MR. BIRGE:  I understand.
24              THE COURT:  Because I'm not even sure that this
25   witness does.
```

```
 1              I think anybody that determines even residence by
 2     going to the miscellaneous provision of a transaction
 3     document to see where notices are supposed to be sent and
 4     then assumes that because it's being sent to a specific state
 5     that that's even their residence --
 6              MR. BIRGE:  I understand Your Honor's frustration
 7     with that.
 8              It was our -- we were attempting to answer that
 9     question by providing the cap table; that although it's
10     undated, we believe it's an accurate representation of the
11     capital structure following the transaction.
12              And that was the document that when I assumed my
13     role as corporate secretary in March of 2013, that I then
14     looked at, verified and attempted to keep updated, the
15     only updates being options that were granted later to
16     management which I was involved in the course of my duties
17     of preparing those documents, you continue to update that
18     document.
19              That document is the best living, ongoing,
20     dynamic, current representation of who those memberships
21     are.  Although the UPRA did effectuate the transaction
22     that put that structure in place, it would be a little
23     difficult to follow it all the way through the UPRA to
24     determine that.
25              THE COURT:  Well, Cahill was involved in this
```

1    transaction.  Maybe I ought to subpoena the lawyers --

2              MR. BIRGE:  Lots of high-profile law firms were

3    involved.  Burr Forman was not involved in the

4    transaction.  But, yes, Cahill, Honigman, Goldman Sachs was

5    providing financing.  There was at least six law firms that

6    did this transaction.

7              THE COURT:  And at the time the transaction

8    occurred, Purchasing Power L.L.C. existed; is that correct?

9              MR. BIRGE:  I believe.  It was a new co. that was

10   formed for the purpose of effectuating the transaction, which

11   is a multistep process.  Initially it was a recapitalization,

12   and then it was a new co. transaction.

13             There was Purchasing Power L.L.C. and Purchasing

14   Power Holdings L.L.C., which is merely a holding company that

15   holds 100 percent of the membership of Purchasing Power

16   L.L.C., the operating company and the plaintiff in this

17   action.

18             THE COURT:  And so in all the world, who is the

19   person that can testify under oath to me as to who the

20   members were of Purchasing Power L.L.C. at the date that this

21   case was removed?  Do you have a good --

22             MR. BIRGE:  We put forward the best person that we

23   believed was involved in that transaction and that can give

24   that guidance on the UPRA and the buyer as noted in the first

25   page of the UPRA.

1          He was -- he became the CEO in the transaction,

2     but prior to the transaction he was not the CEO.  So

3     although he was not -- he was involved, but incidentally

4     involved.

5          And as far as the management of this case, he was

6     very involved early on.  And then when Purchasing Power hired

7     their first internal counsel, myself, in March of 2013,

8     I took over the responsibilities of managing the litigation

9     and responding to the questions.

10          And so the line of questioning about, you know,

11     what happened in preparation for the hearing didn't go to

12     him, it went to me.

13          And we did attempt to do a diligent inquiry into

14     the other ownership interests amongst our private equity

15     investors, and we did confirm based on e-mails from both of

16     their counsels that there was no problem with diversity in

17     those other members.

18          The clear problem is FSP III, as you now pointed

19     out, of course, the Delaware corporation, which was a member

20     upon the completion and the closing of the transaction in

21     October 2011, and remains a member to this day.  There has

22     been no reorganization, no restructuring, no other changes to

23     this point, and it remains the Delaware Inc.

24          That's what I have been able to piece together in

25     getting up to speed as best I could about the company and its

```
 1    history.  And we have done a couple other, you know,
 2    amendments to our credit agreements, some other transactions
 3    where I had to go back and try to figure this out, and that's
 4    what I put together, Your Honor.
 5              And we apologize if it's not, you know, as clean as
 6    it might appear, but this is, you know, a company that was
 7    founded a dozen years ago, grew on its own, didn't have
 8    in-house counsel, and this is the reality.  And we are trying
 9    to be as truthful and honest with you about that reality as
10    we can.
11              THE COURT:  Well, I believe that.  The problem was
12    that when somebody files a lawsuit and makes representations
13    to a court, they are supposed to be really careful about
14    that.
15              MR. BIRGE:  Yes, sir, they are.  And I take that
16    obviously in my daily duties with extreme care in that
17    preparation.
18              THE COURT:  Right.  And that care doesn't go
19    just -- just because you are not a corporate lawyer, that
20    care doesn't mean that it's any less for somebody who takes
21    an action to make a representation to a Federal District
22    Court.
23              MR. BIRGE:  No, Your Honor.  Diversity and
24    residency clearly means something to me that it doesn't to a
25    business person.
```

1          THE COURT:  You know, just because you are a

2    corporate lawyer doesn't mean that it's different for you

3    than it is a litigator.

4          MR. BIRGE:  No.  I just have a different baseline

5    of experience --

6          THE COURT:  Of course.

7          MR. BIRGE:  -- and I'm more familiar with

8    transactional work, that's all, Your Honor.

9          THE COURT:  I will tell you, I don't know where we

10   are, but I don't think I am personally satisfied based upon

11   the presentation and now the -- it's not your fault, but

12   there has been some equivocation and lack of understanding

13   about exactly what the transaction was, and that the person

14   that you called to prove this, whose responsibility it is

15   that I placed upon you to prove what needs to be proved for

16   the circuit, I don't think I have enough information to do

17   that.

18          MR. BIRGE:  The only other document that I am aware

19   of that might provide that proof was the operating agreement

20   of the L.L.C., and I believe it's of the Holdings L.L.C., and

21   I believe that there is a schedule that does at least

22   indicate who the members are now.

23          That's the only other place that I know it's

24   reflected.  The cap table was the best and most accurate

25   representation of that.

1            That second amendment operating agreement has been

2    a stat document.  It was put in place I think following or as

3    part of the recap.

4            THE COURT:  Right.

5            MR. BIRGE:  I am racking my brain to think of what

6    else we can to nail this.

7            We came into this hearing not expecting there to be

8    really any contest about this issue.  In fact, we asked

9    counsel for the other side to acknowledge and stipulate that

10   there was not diversity.  So we were a little surprised by

11   this line of questioning and this doubt that has been

12   attempted to be raised in Your Honor's mind.

13           THE COURT:  Look, it's not lost on me how

14   important it is for there to be no jurisdiction, because you

15   would --

16           MR. BIRGE:  No, understood.  But the question that

17   was posed by the Appellate Court is specific and direct, and

18   we prepared and thought it was a very clear --

19           THE COURT:  Who prepared the capitalization table?

20           MR. BIRGE:  You know, that one-page document that's

21   very fine print was probably prepared and run by the

22   investment bankers.

23           The lawyers probably reviewed it to understand it,

24   but that's typically an Excel spreadsheet.  It is a numbers

25   document.  There was a Stephens investment bank, there was

1    another investment bank on the buy side representing

2    Rockbridge.  I don't know who that was.  My CEO might

3    remember by chance.

4         The document then when I took it over was an Excel

5    spreadsheet.  It became a living document that I kept updated

6    for the option agreements.  Although that document is

7    undated, we believe that that was the accurate representation

8    of the cap table post the transaction and continues to be

9    accurate to this day.

10        THE COURT:  Well, is there somebody at Goldman that

11   could come in who was involved in this transaction?

12        MR. BIRGE:  Goldman did the financing.  They

13   wouldn't be worried too much about the equity side.

14        I mean, honestly, the corporate secretary is

15   supposed to have this responsibility, and you are looking at

16   him.  Now, I wasn't the corporate secretary at the time that

17   occurred --

18        THE COURT:  Was there a corporate secretary at the

19   time?

20        MR. BIRGE:  Our CEO held that title nominally.

21        THE COURT:  Nominally?

22        MR. BIRGE:  Sorry, Your Honor.

23        THE COURT:  As opposed to functionally?

24        MR. BIRGE:  I'm trying to be as honest as I can.

25        THE COURT:  You know, you are the only person that

1    I believe today.

2              MR. BIRGE:  Well --

3              THE COURT:  Because I think you are the only

4    person who is trying to give me the answer that I need as

5    opposed to packaging it in a way to protect themselves.

6    And I appreciate your candor.

7              That's what I expect of litigators.  So maybe if

8    you became a litigator, you wouldn't be as candid.

9              MR. BIRGE:  No chance, Your Honor.

10             THE COURT:  So you still haven't answered my

11   question of who is the person in the world that can best

12   answer that.

13             MR. BIRGE:  I don't know the answer, sir.  The

14   default would be the corporate secretary's typical

15   obligations included managing the books and records of the

16   business, board meeting minutes, and who the shareholders

17   are.

18             You know, the old stock ledgers, you had to notate

19   the ledger.  That was also the corporate secretary that had

20   to notate the ledger.

21             Now that we have moved past stock ledgers and

22   minute books in the corporate transaction world, it's Excel

23   spreadsheets and it's -- it's transactional documents, and

24   then Excel spreadsheets, and that's the best evidence of the

25   ownership for a private organization, of course.  For a

1    public it's a different story.

2             THE WITNESS:  Your Honor, if I may?

3             Would the operating agreements of Purchasing Power

4    L.L.C. that has an ownership table at the end which

5    identifies Purchasing Power Holdings as the 100 percent

6    member, and the Purchasing Power Holdings L.L.C. operating

7    agreement is filed with -- I want to say that's a Delaware

8    L.L.C. identifies the members of Holdings, which these

9    entities here are members of.

10            MR. BIRGE:  That was the operating agreement that

11   I was mentioning that might have the list on it.  The

12   filing with the State of Delaware would not identify the

13   members, but the operating agreement likely had a schedule

14   just after the closing of the transaction which would

15   identify those.

16            MS. SHIRLEY:  Your Honor, the second amended and

17   restated limited liability company agreement of Purchasing

18   Power Holdings L.L.C. that we have just been referring to is

19   part of the UPRA, if Your Honor would like to review it, and

20   it does contain a schedule.

21            And so it starts at Bates No. PP LLC 4339-054.

22   That's the beginning of the document.  And the chart, the

23   unit ownership ledger appears at 4339-123.  And again that's

24   part of the UPRA.

25            MR. BIRGE:  Probably as an exhibit.  Hopefully --

1    I haven't looked at that document, but hopefully it's either

2    in its final form or close to it.

3              Now, that's not the final one that got signed.

4    Exhibits come off when they get put in execution form and get

5    signed, but that should hopefully reflect the same

6    information.

7              THE COURT:  Well, it's ultimately the defendant's

8    responsibility to prove jurisdiction.  You are the one that

9    removed.

10             I have learned my lesson in this that I will never

11   allow lawyers to rely upon each other anymore.  But the

12   requirement for removal is that you have to show the

13   membership of each of the parties in the case to make sure

14   that there is diversity.

15             I understand why you relied upon the representation

16   of opposing counsel in making those representations to me,

17   but the law is pretty clear in the circuit that that's --

18   what you did is not enough, that you have to state what the

19   citizenship is of each member.

20             I now have to do that, and I have got two

21   options.

22             You know, you can continue -- it's clear to me

23   there is a lot of bad blood and you are having a hard time

24   talking to each other, so there is a possibility of maybe

25   that at least for my purpose, since I have already -- I can't

1    tell you how much time I have invested in this case.  And to

2    think that that's all been lost and to know under our current

3    staffing how many people were deprived of my time because of

4    you shows what happens when lawyers don't do what they are

5    supposed to do, and neither of you have.

6         So maybe in a moment of reconciliation that you

7    might have, you might be able to at least do whatever you

8    need to do so that when I continue this hearing, which I am,

9    that I can find out who it is that at the moment that you

10   tried to remove, who the members of the L.L.C. were.  And if

11   not, you can tell me at least who you are going to call to

12   tell me who the members were if you can't agree amongst

13   yourselves.

14        And as I say, the only person that has tried to

15   help me today rather than trying to protect their

16   self-interest is -- your name, whatever it happens to be.

17        MR. BIRGE:  Sorry.  Greg Birge, general counsel,

18   sir.

19        THE COURT:  And that is the only bright spot in

20   this hearing is somebody trying to help me do my duty to the

21   circuit, because you really haven't.

22        So I am going to give you until tomorrow afternoon

23   to let me know whether or not you can try to operate in good

24   faith with each other to fulfill your obligation to me which

25   you have failed so far on this jurisdictional issue to see

what else I need to do to get what I need to make my -- to
enter an order and my findings with the court.

Or if you can't do that -- I am not sure you can --
at least tell me who when at a continued hearing I would hear
from so that I can say everybody has had their shot, and then
I will make whatever factual findings I will, because I can't
make them on the record that's been presented.

And if that means that I invite you back, I could
at least say I find somebody who is credible and trying to
help, which would be something different than what's happened
here this morning.

And although I think you have -- I understand what
happened to you, and I'm sorry that that has happened, but I
know that you probably are delighted that this order that
I entered is not enforceable, which I think is probably where
this is all going to end up.

But I want you to know I spent a ton of time trying
to reach the right decision in this case based upon the
complaint that was filed and the discovery that was
conducted, so at least you have got a view of the strength of
your case.

So you have until Friday 5:00 to let me know what
you are going to do, and that's either that you can come up
with some agreed set of information to be submitted to me
upon which I can make a finding, and, if not, who it is that

```
1    will testify at the next hearing to give me the information
2    that I need to enter an order and to give it to the court.
3              I suspect you both know how I feel about this
4    case.
5              Burr Forman, I have got extreme -- I am very
6    concerned about the professionalism and the representations
7    that were made to me.
8              I'm equally disappointed that a firm can't read a
9    case from the Eleventh Circuit and on a removal fulfill their
10   obligations of what's required under the law.  And while
11   I sympathize that you ought to be able to rely upon what a
12   lawyer on the other side tells you and be able to take that
13   to the bank, maybe you will learn a lesson that you shouldn't
14   do that very much.
15             Because if you had done what you were supposed to
16   do, which is to state the citizenship of the members of the
17   L.L.C., you may well have concluded that they don't even
18   know, which until they got a general counsel I don't think
19   they did.  But the manner in which they tried to figure it
20   out is disappointing in the extreme.
21             But ultimately you should have said that's not
22   enough.  The circuit said I have to allege on removal the
23   citizenship of the members, and you didn't do that.
24             And I will tell you, the one thing that I kick
25   myself about is I have a form order every time I get a case
```

1      that I send out if an L.L.C. -- if there is any question on

2      diversity, if they have not alleged who the members are, and

3      I make them do that.

4             And the thing that I am disappointed in myself is

5      that I trusted you and the representations that you made and

6      didn't require you to do what I require of every other

7      litigant, and that you will now know that I will never, ever

8      take a shortcut again.

9             We will wait to hear from you on Friday.

10                  (Proceedings adjourn at 12:22 p.m.)

1                    C E R T I F I C A T E

2

3    UNITED STATES OF AMERICA        :
                                      :
4    NORTHERN DISTRICT OF GEORGIA     :

5

6            I, Nicholas A. Marrone, RMR, CRR, Official Court

     Reporter of the United States District Court for the Northern
7
     District of Georgia, do hereby certify that the foregoing 96
8
     pages constitute a true transcript of proceedings had before
9
     the said Court, held in the city of Atlanta, Georgia, in the
10
     matter therein stated.
11
             In testimony whereof, I hereunto set my hand on
12
     this, the 20th day of August, 2014.
13

14

15

16                             /s/ Nicholas A. Marrone
17                             _____
                               NICHOLAS A. MARRONE, RMR, CRR
18                             Registered Merit Reporter
                               Certified Realtime Reporter
19                             Official Court Reporter
                               Northern District of Georgia
20

21

22

23

24

25